ALBERT DALLEMAND *et al.*

*v.*

ISAAC SAALFELDT, Admr.

*Opinion filed October 24, 1898.*

1. NEGLIGENCE—*when jury may presume that the deceased was using ordinary care for his safety.* In an action for damages by an administrator for the death of his intestate from falling down an elevator shaft, evidence that the deceased was intelligent, sober and careful will authorize the jury to presume that he was using ordinary care for his safety, where there is no evidence to the contrary and where there are no eye-witnesses of the accident.

2. SAME—*whether servant was directed to act or was a mere volunteer is a question for the jury.* Whether a servant who was killed by falling from an elevator while delivering goods from floor to floor was a mere volunteer or was directed to do the work is a question for the jury, and it is not unreasonable for them to hold the latter view under evidence that the foreman gave the order to a group of men, including the deceased, without designating which was to act.

3. MASTER AND SERVANT—*mere knowledge of some danger is not an assumption of increased risk.* Although a servant has knowledge of the danger attending the use of an elevator in its unsafe environment, he may obey the master's order to use the same without assuming the increased risk, unless the danger was such that an ordinarily prudent man would not have encountered it.

*Dallemand* v. *Saalfeldt,* 73 Ill. App. 151, affirmed.

APPEAL from the Appellate Court for the First District;—heard in that court on appeal from the Superior Court of Cook county; the Hon. JONAS HUTCHINSON, Judge, presiding.

David Saalfeldt, a youth nineteen years old, was employed by appellants in their bottling works in the city of Chicago, to wash bottles. While thus employed, together with two other servants of appellants, in the basement of appellants' establishment, Cavanaugh, the foreman there, received an order from Casey, the foreman on the third floor, to send him (Casey) some bottles. The foreman shouted an order to the three bottle washers to send some bottles to the third floor, without designating which of them should do it. Cavanaugh testified that Saalfeldt had no orders to send up bottles, but that there were standing orders that the two other men should send them, but Keating, the general manager, testified: "His duty was to wash bottles, clean them properly and put them to drain. It was not his special duty to bring up and down bottles, but he did so at times. When he was asked to assist one of the foremen in taking a large load of bottles off, it was his duty to accompany the men. The bottles were carried in cases and barrels." Saalfeldt, however, put a case of bottles on the freight elevator and went up, managing the elevator himself, and delivered the bottles to Casey on the third floor. He then returned to the elevator to go up and get some bottles, as he said, from the fifth floor for Casey. Casey testified that he was looking at the elevator at the time, and in about half a minute after Saalfeldt started up saw him falling be-

low the elevator down the elevator shaft. Saalfeldt fell to the basement and was killed. The elevator stopped automatically a few inches above the fifth floor. No one saw Saalfeldt when he fell into the shaft, or testified how the accident happened.

At the time of the injury the following ordinances were in force in Chicago, and were given in evidence:

"Sec. 1571. Hoistways in which an elevator shall be used shall be constructed entirely of brick, from its lowest point, extending up through and six feet above the roof. All openings in such hoistway shall be protected by iron doors, and no wood shall be used upon the inside of such hoistways.

"Sec. 1572. Doors in such shaft shall be made of metal, and the catches or fastenings upon such doors shall be so placed that they can be opened only from the inside of the shaft and entirely under the control of the elevator operator.

"Sec. 1573. All openings not having doors shall have metallic frames, with prismatic lights in iron frames.

"Sec. 1614. All doors in shafts of elevators shall have latches so contrived that a key shall be used to unlatch the doors from the outside, but may have a knob or handle to open the door from the inside.

"Sec. 1653. It shall be the duty of every person owning, controlling and operating or using, as owner, lessee or agent, any passenger or freight elevator in any building within the corporate limits, to employ some competent person to take charge of and operate the same, and any such person who shall neglect to comply with the provisions of this section shall be fined the sum of $10 for each and every day of such neglect."

The doors to the elevator shaft were of wood, and could be opened either from the elevator side or the room side. "In the basement and fourth and fifth floors were folding doors working on hinges, and, including both doors, about six feet wide. The first, second and third

stories had sliding doors the full width of the respective openings, and were operated by lifting or sliding up the door toward the ceiling, where it remained until pulled down. There was a bar across each door from two and a half to three feet from the floor, which was attached by hinges at one end, and could be raised or lowered from either inside or outside the elevator. No particular person had charge of the elevator or its operation at the time of the accident, nor was any person employed by appellants for that special purpose." The doors were kept open in the day time. Eisendrath, an architect, testified that the elevator carriage was in the regular form of a freight elevator,—"simply a large platform with the usual side-bars and cross-bars to hang the carriage on." Saalfeldt had run the elevator up and down a number of times, —one witness testified to a dozen times and another testified that he manifested ability to handle it,—but it did not appear from the evidence whether or not the proper and safer mode of using it had been explained to him or whether he fully understood how to use or control it. The evidence tended to show that the deceased was an intelligent boy, sober, industrious and careful.

Appellee recovered a judgment for $1750. The Appellate Court has affirmed the judgment, and appellants have further appealed to this court.

MARCUS KAVANAGH, and C. LEROY BROWN, for appellants.

MOSES, ROSENTHAL & KENNEDY, for appellee.

Mr. CHIEF JUSTICE CARTER delivered the opinion of the court:

The only error insisted upon by appellants is, that the trial court erred in refusing to give to the jury the instruction asked by them, at the close of the evidence, to find the defendants not guilty. We are therefore called

upon to decide whether or not the evidence, taken as true and in its most favorable bearing in support of plaintiff's cause of action, with all proper inferences which might be justifiably drawn from it, was so insufficient to support the judgment that it should for that reason be set aside. Whether or not the verdict should have been set aside as being against the weight of the evidence, is, of course, a question of fact which has been finally settled. We have to do only with the question of law.

It is not contended that appellants were not in default in failing to comply with the ordinances of the city respecting elevators, but the first contention is that such default was not the proximate cause of the injury—that no causal connection is shown between such default and the accident to the deceased. It is plain from the evidence that had the ordinance been complied with and the doors to the openings been kept closed the accident could not have happened. There was no opening between the platform of the elevator and the walls of the elevator shaft through which Saalfeldt could have fallen, and it is clear from the evidence that he must have fallen into the shaft from the open space at the doors after the elevator passed up, and, taking the evidence as true, this could have happened only at the fourth floor, and as Casey, who had charge of the work on the third floor, testified that it was only about half a minute after the elevator started up from the third floor that he saw the deceased falling down the shaft beneath the elevator, we cannot say, as a matter of law, that it was an unjustifiable inference for the jury to draw that Saalfeldt was in some manner caused to fall from the elevator into the open space at the open doors of the fourth floor and from thence into the shaft beneath. As we understand the evidence, the platform of the elevator was supported by a framework of bars, but was not enclosed, and its entire front was open and of the same width as the doors,—six feet. There was a wooden bar across the open doors at the fourth floor, three

feet and a half from the floor. These were double doors, eight feet and three inches high, and swung on hinges opening into the room. At the top, when closed, they fitted against or into the lower edge of the wooden partition or lining of the elevator shaft that extended up to the next opening. The operating cable was one foot from the opening. We are of the opinion that it would not have been, in the eye of the law, an unreasonable conclusion for the jury to reach, from the evidence, that the combination of these open doors, with the bar across them and the horizontal edge of the partition projecting downward from above, were unsafe to one on the ascending elevator and necessarily standing near the opening to work the cable, and when this condition of things connected with the elevator was maintained by the appellants in violation of the city ordinances their negligence was sufficiently established. It seems not at all unreasonable that the jury should have found, not only that the defendants below were guilty of negligence, but that such negligence was the proximate cause of the injury. Both were questions of fact, and it would have been error had the court given an instruction to the contrary.

The evidence shows that Saalfeldt was an intelligent, sober and careful youth, and from this evidence and the circumstances before them, and as there was no eye-witness to the accident and no countervailing evidence, the jury were authorized to find that he was, at the time of the injury, using due care for his own safety. (*Illinois Central Railroad Co.* v. *Nowicki*, 148 Ill. 29.) And as the record is made up, we must assume, if such an assumption were at all necessary, that the court below instructed the jury that the plaintiff could not recover unless they believed, from the evidence, that at the time of the accident he was observing due care, for the record shows that after the court refused the instruction to find defendants not guilty, other instructions were asked and given on behalf of each party, but they are not in the record.

So far we have a case where there is such evidence tending to prove that the injury complained of was caused by the neglect and default of the appellants, and while appellee's intestate was observing due care for his own safety, that the jury could, without acting unreasonably in the eye of the law, so find, thus making these questions of fact and not of law. A more serious question is presented by the objection urged that Saalfeldt, as the servant of appellants, assumed the risk as one incident to his employment. The general rule of law on this subject is too well settled and understood to require comment or citation of authority, but whether a given case comes within the rule is not always easy to determine. As a question of fact it has, by the judgment of affirmance of the Appellate Court, been finally determined in this case that the risk was not incident to the duties which, by his employment, Saalfeldt undertook to discharge, or else that the facts were such as to bring it within an exception to the general rule, and we are concerned only with the legal question whether or not there was any evidence on which such finding could reasonably be based. The witness Keating, who testified that he was the superintendent of appellants' whole business outside of the office, further testified that Saalfeldt was employed to wash bottles in the basement, that he had no other duties, and that he had nothing to carry up stairs or down stairs as a part of his duties. Cavanaugh also testified that that was no part of his duties. There was no one employed for the special purpose of running the elevator, but there was evidence that Saalfeldt had run it a number of times and appeared to understand how to run it. The jury were warranted in finding, from the evidence, that it was no part of the duty of Saalfeldt to take cases of bottles up or down on the elevator, and that therefore the dangers attending that work were not incident to his employment nor assumed by him by virtue of his contract of service with his employers.

But it is said that Saalfeldt volunteered to take the bottles up on the elevator without any order to do so by any one having authority so to direct, and that in so doing he voluntarily assumed the risk also. We agree with the Appellate Court that it was a question of fact for the jury whether or not Saalfeldt acted voluntarily in taking the bottles up on the elevator, or in good faith upon the order of Cavanaugh. Cavanaugh had charge over the men in that department and gave the order to take up the bottles. Saalfeldt had done such work before and had not been forbidden to do it. Cavanaugh, the foreman, did not specify which of the three men should obey him, and clearly the jury may have found that the order was addressed to the three men, to be obeyed by any one of them. Whether Saalfeldt properly acted in obedience to such order or not was clearly a question of fact for the jury, and not of law for the court.

It is, however, further contended, that whether the risk was incident to his contract of employment and therefore one assumed by him, or whether it was incident to the special service which he undertook to perform in obedience to orders, the judgment is erroneous, because, it is said, he had knowledge of the condition of the elevator and its unsafe surroundings, and having undertaken to perform it with such knowledge he could not hold his employers, the appellants, liable. He had been engaged in his work for appellants from five to seven weeks. The evidence does not show that they ever gave him any instructions regarding the use of the elevator or any information respecting the dangers to be guarded against in using it, and in view of the facts and his inexperience and youth it cannot be said, as a matter of law, that there was no evidence upon which a finding could be based that he did not have knowledge of the danger or that the danger was not apparent. Whether or not the danger was apparent, or he had knowledge of it, were questions of fact. Besides, the burden of showing such knowledge was

on the defendants below. (14 Am. & Eng. Ency. of Law, 844.) Again, if the fact was,—and in support of the judgment, there being evidence to the point, we will assume the jury so found,—that Saalfeldt performed this particular service by order of his employers, given through the foreman, and that it was outside the scope of his employment, then the risk would be one which he did not, by virtue of such employment, necessarily assume; (2 Bailey on Master and Servant, secs. 3476, 3502; 14 Am. & Eng. Ency. of Law, 856, 857; *Linderberg* v. *Crescent Mining Co.* 9 Utah, 163; *Pittsburg, etc. Railroad Co.* v. *Adams,* 105 Ind. 151;) and in such case, although he had knowledge of the dangers attending the use of the elevator in its unsafe environment, he was not bound to disobey on pain of assuming the risk, but might perform the service and hold his employers liable, unless the danger was such that an ordinarily prudent man would not encounter it. Ibid.; *Illinois Steel Co.* v. *Schymanowski,* 162 Ill. 447.

However weak the plaintiff's case may have been upon the evidence, we are unable to find, as matter of law, that any fact necessary to a recovery has been found without evidence to support the finding. The judgment must be affirmed.                                   *Judgment affirmed.*