## Pittsburg, C., C. & St. L. Ry. Co. et al. v. William T. Hewitt.

1. MASTER AND SERVANT—*Duty of the Master to Provide for the Safety of the Servant.*—One of the duties which a master owes to his servant is to make such provision for his safety as will reasonably protect him against the dangers incident to his employment.

2. SAME—*Duty to Give Notice of Latent Defects.*—Where there are latent defects or hazards incident to an occupation, of which the master knows or ought to know, and which the servant, from ignorance or inexperience, is not capable of understanding and appreciating, it is the master's duty to warn or inform him of them.

3. SAME—*Risks Assumed by the Servant.*—The servant assumes such risks of his employment as are usually incident to it, and the extraordinary hazards of which he has notice, or which in the usual exercise of his faculties he ought to have noticed, but he does not assume the risk of dangers known to the master which can be avoided by him in the exercise of reasonable care.

4. SAME—*What the Servant has the Right to Presume.*—The servant has a right to presume that all proper attention will be given to his safety and that he will not be carelessly or needlessly exposed to risks not necessarily resulting from his occupation and preventable by ordinary care and precaution on the part of his employer.

5. SAME—*What the Servant May Assume in Obeying Orders of the Master.*—A brakeman, when ordered by the conductor of his train, whom it is his duty to obey, to make a coupling, has the right to assume that the coupling may be safely made, unless the danger in making it is so apparent and imminent that a reasonably prudent man would have refused to make it.

6. SAME—*Duty to Instruct Inexperienced Employes.*—It is the duty of the master to instruct inexperienced employes as to the performance

of their duty or to warn them of risks known to him and unknown to such employes.

7. INSTRUCTIONS—*Must be Presented in Apt Time.*—Under the rule of the Superior Court of Cook County that "all instructions must be presented to the court at the conclusion of the evidence," an instruction presented nearly at the close of the address of the plaintiff's attorney to the jury, is properly refused in this case.

**Trespass on the Case,** for personal injuries. Appeal from the Superior Court of Cook County; the Hon. THEODORE BRENTANO, Judge presiding. Heard in this court at the October term, 1901. Affirmed. Opinion filed June 23, 1902.

**Statement.**—This is an appeal from a judgment recovered by appellee against the above named appellant and the Pennsylvania Company, for damages on account of an injury alleged to have been occasioned by the negligence of appellants. It appears from the testimony of appellee that about September 17, 1899, he, desiring to secure railroad work, procured from his father and took to Mr. C. H. Walton, the superintendent of the Chicago Terminal Division of the Pennsylvania Company, a letter, and that Mr. Walton referred him to Mr. Coneys, trainmaster of the Pennsylvania Company, and that the latter asked him his age and whether he had ever worked around a railroad, and after appellee had been examined by the medical examiner as to his sight and hearing, Mr. Coneys gave him a note to take to Mr. Griffith, the general yardmaster of the Pittsburg, Ft. Wayne and Chicago yards, which note he took to Mr. Griffith, and Mr. Griffith introduced him to a conductor and told the conductor that appellee was to go to work; that he was a student, and that he, the conductor, was to show him all that he could; that he worked there as a student for ten days, and after the expiration of that time, two days as a regular yard brakeman, when he went to Mr. Coneys and asked to be transferred to the P., C., C. & St. L. on the west side of the city, as his home was there, and Mr. Coneys gave him a note to Mr. Depuis, the general yardmaster of the last named company, who told him to report at the Fifty-ninth street yard the next morning, which he did, and worked at those yards twenty-four days

as a switch-tender, after which he was idle eight days, and then, after working two more days as a switchman, he went back to the Fifty-ninth street yards, and was sent by the yardmaster there to the yardmaster at Leavitt street, where he worked as switchman or yard brakeman, and on the third day of his working there the injury occurred.

It appears from the evidence that the employes at the yard, including appellee, were about to shove down cars on a track in the yard, and make proper separations between the cars for the street crossings; that appellee, who was acting as rear brakeman, notified the flagman, who in turn notified the tower man to lower the gates at the street crossings, and then appellee signaled the engineer to back up. The engine was at the west end of the train, which consisted of about fourteen cars. In doing the work it was necessary to couple onto the train a car belonging to the Hocking Valley Railroad Co., on which was a Buckeye drawbar coupler, and the car to which that car was to be coupled had a Jenney drawbar coupler. The Buckeye and Jenney drawbar couplers, when brought together, couple automatically and without danger to the brakeman, but in the present case the tongue of the Buckeye coupler, the object of which is to hold the knuckle closed, was broken, in which case it is necessary to use a link and pins in order to make the coupling, as was the custom before the invention of automatic couplers. Appellee testified that after he signaled the engineer to back up, he looked at the Hocking Valley car to see the nature of the coupling he would have to make, and saw there was a link in the coupler; that he used the proper appliance to open the knuckle and found that it was broken, and that it was rusty where the break was, and ascertained, on closing the knuckle, that it would not lock. He further testified as follows:

" When I discovered it wouldn't lock, I put the link and pin back in and then signaled the train to back up again. When they were about five feet apart I signaled them to stop, figuring that the slack would make the coupling. In all car couplers there is a certain amount of slack, that is, they will stretch out; it is due to the springs and drawbars;

and having so many cars next to the engine I thought they were stretched out far enough to make the coupling and at the same time not strike the other cars hard enough to bump them over Paulina street. After I gave the signal to stop, I heard him put on air-brakes at the time, and when the cars were about a foot apart I saw that the slot of the knuckle on the approaching car was about the width of the slot lower than the one on the car that was standing still, and that the link in the position it was in would not enter. I then took hold of the link and pushed it back and lowered it so that it would have enough play to enter the other drawbar. It was a regular link, about a foot long. The length of the inside of the link was ten inches. While this car was moving back I had hold of the link, holding it with my right hand. I held the link in order to have it enter the other drawbar; it would not enter the slot in the knuckle of this other coupler without holding it. As I saw it enter, sure it had entered, I dropped my hand. I had to hold it straight, that is, straight with the car and the end down, and guide it sidewise, on account of the shape of the slot; it being opened on one side, the drawbar would have a tendency to push the link away and the pin would drop into the opening in the link. I had the pin set, yes, sir. I continued to hold the link until I saw it enter the other drawbar or coupler far enough so the pin would enter the link as it dropped. I mean by that I held it until I saw it get under the pin. By the time it got under the pin the faces of the approaching knuckles were not more than four inches apart. I withdrew my hand and turned to see where I would step out; as I did so, they came together; when they came together they slid by the knuckle. My hand was caught on the side of the face of one of the couplers and by the guard of the other. The tracks were very close together so cars on them would not allow me to stand broadside. I was standing this way (indicating). The space between the cars there that you had to step out into was, I should say, about fifteen inches. Not knowing whether the bump of the other cars would take it far enough down, I had to step out to be sure it was, so it wouldn't knock me down and at the same time injure me again."

Appellee testified that he had not been instructed with reference to coupling broken automatic couplers with pin and link, and had had no experience in making such couplings. Asked whether the knuckles of the couplers could pass each other with both knuckles shut, he answered that

they might on a curved track, but that he had never seen them do so on a straight track, and that the track on which the cars were shoved is straight. There is other evidence in the case tending to prove that there is greater danger in coupling with a link and pins, the old style of coupling, than with automatic couplers in good order. Appellee testified that he was directed by Mr. Austin, the conductor at the time in question, to make the coupling. It was admitted on the trial by counsel for appellants that the Hocking Valley car was received at the Fifty-ninth street yards November 9th, and was sent from there to the Leavitt street yards in the evening of that day, and was received at the Leavitt street yards some time during the night of November 9th and remained there till the time of the accident. It appears from the evidence that the Hocking Valley car, on which the defective coupler was, was not inspected at the Leavitt street yards prior to the accident, and that it was not properly inspected at the Fifty-ninth street yards. J. E. Barton, car inspector for the Pan Handle road at the Leavitt street yards, testified that the system of inspection at that yard was to inspect cars as soon as they came into the yard; that when a train pulled into the yard, the inspector put a flag on the end of the train and proceeded to inspect the cars, and that if, on inspection, defects were found which could not be remedied there, the car would be sent to the repair tracks at the Fifty-ninth street yards; that the car in question came into the Leavitt street yards some time in the night and he found it there in the morning; that it had on it an initial of the car inspector at the Fifty-ninth street yard, which would indicate that it was in good order; that he, witness, examined the car shortly after appellee got hurt, and that it had a link pin in it, and he found blood on the knuckle and the guard arm next to it, and that he looked at the face of the break and concluded from the dark brown rust on it that the break was from a week to ten days old. Witness further testified that to substitute a new knuckle for the broken one in the Buckeye coupler would take about five minutes, and that this was in fact done at the Leavitt street yards November 10th, after

the accident; also that it was customary at the Leavitt street yards to inspect cars arriving there from the Fifty-ninth street yard, just as if they had not been in the latter yard, and regardless of the marks on them.   The evidence shows that the patent drawbar couplers had holes in them, so that a link could be used for coupling in an emergency occasioned by a coupler breaking, but that the patent ones were not so well adapted for coupling by means of links and pins as were the old style drawbars.

Edward H. Fletcher, a yardman and switchman, called as a witness by appellants, testified on cross-examination that the old style drawbar had a slot which went all around, so that when the end of the coupler entered the slot it would push into place, and not fall out sideways; but that, in the patent coupler, the slot is open at the side, so that the link could fall out at the side, but that the link could be held in place by holding a stick on the open side of the slot. Witness further testified that he had never had occasion to make couplings between patent couplers with link and pin, except when the couplers were out of order, and that their being out of order was not ordinary or frequent, but would sometimes occur.

The evidence is that the injury occurred by the knuckles slipping by each other, and Barton, the car inspector, testified that patent couplers, with both knuckles closed, rarely slip by.

Appellee was between twenty-one and twenty-two years of age at the time of the accident.   He describes the injury thus:

" The stub of the forefinger of the right hand is nearly half an inch long.   The stub of the second finger of the right hand is possibly three-quarters of an inch long.   The other two fingers—this finger here has a part of the corner, or end you might call it, taken off.   The nail of the thumb was taken off, part of it.   That don't bother me now."

He was earning, when injured, twenty-five cents per hour, and the hours per day were ten.   After his wounds healed, he found great difficulty in getting employment of

any kind, being asked about his fingers when he applied for employment. At the time of the trial he was doing general work in the shipping room of a firm, assisting the shipping clerk. The jury found the appellants guilty and assessed the appellee's damages at the sum of $3,000, for which sum judgment was rendered.

GEO. WILLARD, attorney for appellants.

FRANCIS J. WOOLLEY, attorney for appellee.

MR. JUSTICE ADAMS delivered the opinion of the court.

Counsel for appellants contend, but not very strenuously, that the use of the links and pins, as a means of coupling broken patent couplers, was one of the ordinary risks of appellee's employment, which he assumed, and that there is no ground for the contention that he did not appreciate the danger of that kind of coupling. We think these contentions are fully answered by the evidence. When appellee sought employment by appellants, if he assumed anything, it was ignorance of railroad work; he, however, then assumed nothing; but frankly told the trainmaster, to whom he was referred by Superintendent Walton, that he had never worked around a railroad, and the trainmaster, on learning this, turned him over to another railroad man for instruction, telling the latter to show him everything he could. When, finally, he was regularly put to work, which he testified was October 5th, what did he impliedly assume to know? Certainly not more than he had been taught by his appointed instructor. Appellants, by their agent, were his instructors; their agent must have known just what he was taught to do, and, legally, they must be presumed to have known what their agent knew. It appears that he learned how to couple the cars with patent automatic draw-bar couplers in good order; but he testified positively, and without contradiction, that he had had no experience in coupling cars with pins and links prior to the accident, and had not been taught how so to do. It does not appear from the evidence that he even had any experience in coupling any

cars furnished with the old style couplers, with pins and links. Under these circumstances it can not be held that he assumed the risk of coupling, by the use of links and pins, broken patent couplers. The evidence, too, is, that such coupling was not a usual or ordinary occurrence or risk, and this, doubtless, was the reason why his instructor omitted to show him how to make such a coupling.

In Alton Paving Co. v. Hudson, 176 Ill. 273–4, the court say :

" One of the duties which a master owes to his servant is to make such provision for his safety as will reasonably protect him against the dangers incident to his employ-ment. We said in Consolidated Coal Co. v. Haenni, 146 Ill. 614, (on page 626): ' As to the master's duty to give notice, the law is, that if there are latent defects or hazards incident to an occupation, of which the master knows or ought to know, and which the servant, from ignorance or inexperience, is not capable of understanding and appre-ciating, it is the master's duty to warn or inform the serv-ant of them '—citing authorities. While it is true that an employe assumes such risks of his employment as are usu-ally incident thereto, and of the extraordinary hazards of which he has notice, or which, in the usual exercise of his faculties, he ought to have noticed, he does not take the risk of danger known to the master which can be avoided by him in the exercise of reasonable care. ' He assumes the risk, more or less hazardous, of the service in which he is engaged. but he has a right to presume that all proper attention shall be given to his safety, and that he shall not be carelessly and needlessly exposed to risks not neces-sarily resulting from his occupation, and preventable by ordinary care and precaution on the part of his employer.' (Buzzell v. Laconia Mfg. Co., 48 Me. 113.) According to the plaintiff's declaration he was inexperienced in the mat-ter of his employment, and especially he had no informa-tion as to the danger of the clay falling upon him. Nor was he in any way connected with the removal of the clay, so as to prevent its falling. It could not, we think, in any view of the record, be said that he was bound, in the exercise of his faculties, to know the peril which caused his injury."

We think the language quoted applicable to the facts of this case. The risk, of coupling broken patent couplers with links and pins was known to appellants, and not to

appellee. They undertook to instruct him how to perform the services which might be required of him, one of which, although extraordinary, was the coupling with links and pins of broken patent couplers, and this they failed to do. The custom of inspection of cars was known to appellee. He testified that there were inspectors in the Leavitt street yard, and that the custom of the inspector was to put a flag on a train in from thirty minutes to an hour after it came into the yard, and to inspect it, testing the wheels, brakes, chains, drawbars and couplers. In the present case the car in question was inspected improperly, if at all, at the Fifth-ninth street yard, and not at all at the Leavitt street yard; and the evidence shows that the defect in the coupler was easy to be seen, and that it could have been remedied in about five minutes. The custom of inspection being known to appellee, and he finding the car on the track, unflagged and apparently ready to be coupled onto a train, and being directed by the conductor of the switching train to make the coupling, he had the right to assume that it might be safely done. But appellants' counsel urges that before appellee undertook to make the coupling, he saw the broken condition of the Buckeye drawbar. This is true, but it was after he had signaled the engineer to back up, and after he had been ordered by the conductor of the train, whom it was his duty to obey, to make the coupling; and he had the right to assume that the coupling might be safely made. Unless the danger was so apparent and imminent that a reasonably prudent man would have refused to make the coupling, appellee can not be charged with negligence in obeying the conductor's order, nor the liability of appellants held to be excluded. Offutt v. Columbian Exposition, 175 Ill. 472, 479.

That such was not the case is shown by the testimony of appellants' witnesses. It is not enough that appellee saw the defect. To avail appellants, it must appear that he appreciated the danger which might result from it. C. & E. I. R. R. Co. v. Knapp, 176 Ill. 127.

We think the jury fully warranted by the evidence in

finding that he did not appreciate the danger.    That appellants were negligent in not inspecting the car and remedying the defective coupler, is made so plain by the evidence as to render argument unnecessary.    That, in view of appellee's inexperience in and ignorance of railroad work, which were well known to appellants, it was their duty to instruct him how to make the coupling, or, at least, to warn him of the risk, is sustained by the following authorities: Dalleman v. Saalfeldt, 175 Ill. 310; Alton Paving Brick Co. v. Hudson, 176 Ib. 270; Reynolds v. Maine R. R. Co., 64 Vt. 66; Mo. Pac. Ry. Co. v. Callbreath, 66 Tex. 506; Mo. Pac. Ry. Co. v. White, 76 Ib. 102; I. C. R. R. Co. v. Price, 72 Miss. 862; Bailey's Personal Injuries, etc., Sec. 2664, *et sequens.*

We find no material error in the court's rulings on evidence.    Numerous objections are made in regard to instructions given, modified and refused, but we think it unnecessary to refer to more than two of them.    The following instructions were asked by appellants' counsel:

" 12.    The jury are instructed that the frequency or infrequency with which the drawbars might be broken is not a test whether the use of the broken drawbar was incident to the duties of a switchman.

13.    The jury are instructed, as a matter of law, that the defendants did not guarantee the safety of the plaintiff."

These instructions were asked nearly at the close of the address of plaintiff's attorney to the jury, and the court refused to give them, because of the following rule of the court:

" All instructions must be presented to the court at the conclusion of the taking of the evidence."

Appellants' counsel contends that the rule has no application in the present case, for the reason that the instructions were asked because the plaintiff's attorney urged, in his argument to the jury, that breakage was unusual, and that the defendants were substantially guarantors against injuries of the kind in question.    In support of the contention that to apply the rule to a case in which an occasion

for an instruction arises during argument to the jury would be unreasonable, counsel cites Standard Fire Ins. Co. v. Wren, 11 Ill. App. 242, and Kepperly v. Ramsden, 83 Ill. 354, 359. We concur in the view of the court expressed in Kipperly v. Ramsden, that to apply the rule when an instruction is rendered necessary by the remarks of opposing counsel in addressing the jury, would be unreasonable. But we find nothing in the argument of the plaintiff's attorney which, in our opinion, rendered necessary the giving of the instructions in question. On the contrary, plaintiff's attorney, in his address to the jury, used the following language:

"I will admit right here, that it is ordinary, that sometimes things will get broken in the railroad business. It can not be helped. Nobody is to blame."

Defendants' attorney, in his address to the jury, said:

"I tell you, gentlemen, according to my understanding, there is no law that makes the master, or employer, a guarantor of the safety of any of its employes; that the safety of the employes depends largely upon themselves," etc.

In the closing argument of plaintiff's attorney, he said:

"Now I come next to the question of the proposition of law which Mr. Willard suggests. He says there is no provision under the law that makes an employer a guarantor. That is true. Anybody who guarantees a thing is absolutely liable. If an employer was a guarantor, that would mean that every time a man got hurt, whether his own fault or his employer's fault, no matter whose fault, his employer would have to pay for it. We don't claim that is the law."

In view of the foregoing, we think there was no error in refusing appellants' instructions 12 and 13. We are inclined to the view that the giving instruction 12 would have been improper at any stage of the trial.

It is claimed that the amount awarded as damages is excessive. Appellants had a fair trial. The jury is the body to which the assessment of damages in such cases as the present is committed by law. We can not say that we are better qualified than was the jury to fix the amount of the damages. The judge who heard the evidence, over-

ruled appellants' motions for a new trial, thereby agreeing with the jury, and the amount awarded is not such that we can infer from it that the jury was influenced by prejudice, partiality or undue sympathy. Under these circumstances we do not feel that we would be warranted in holding that the amount awarded is excessive. Finally, counsel objects that the judgment is erroneous as to the Pennsylvania Company; that the evidence is that appellee was in the employ of the P., C., C. & St. L. Ry. Co. It sufficiently appears from the evidence that the Leavitt street and Fifty-ninth street yards were under one and the same management, and that employes of the companies were sent to one or the other as appeared to be convenient. In addition to the evidence referred to in the statement preceding this opinion, Depuis, who was general yardmaster for the P., C., C. & St. L. Ry. Co., says that Coneys, the trainmaster to whom appellee was referred by Mr. Walton, the superintendent of the Chicago Terminal Division of the Pennsylvania Company, was acting for the Pennsylvania Company and the Pan Handle, and was witness' superior, and that the Pan Handle and Ft. Wayne were known as lines of the Pennsylvania Company. Murray, foreman of inspectors on the Pan Handle side of the Chicago Terminal Division of the Pennsylvania Company, testified that he was working for both companies; and Austin, appellee's conductor, testified that he was working for both companies. Appellee, also, worked for both companies. The objection can not be sustained.

The judgment will be affirmed.