[No. 16687.   Department One.   May 18, 1922.]

## J. J. NICHOLS, *by J. E. Fraser, Receiver, Appellant,* v. OREGON-WASHINGTON RAILROAD & NAVIGATION COMPANY; *Respondent.*[1]

MASTER AND SERVANT (119)—NEGLIGENCE—CONTRIBUTORY NEGLI-GENCE—COMPLIANCE WITH ORDERS—PROXIMATE CAUSE—EVIDENCE—SUFFICIENCY. Obedience to a master's order cannot relieve a servant of the effect of his own contributory negligence which was not the proximate result of the order; hence an order to take a team two miles to camp and return does not excuse a servant in negligently driving the team along a railroad track where they were caught and killed by a train.

NEGLIGENCE (38)—EVIDENCE—WEIGHT AND SUFFICIENCY. Recovery for the death of a horse, which ran away when one of the defendant's employees dumped a scraper, cannot be sustained where there was no evidence that the dumping of the scraper was negligently done, nor any evidence to show how the accident happened.

Appeal from a judgment of the superior court for Spokane county, Lindsley, J., entered May 16, 1921, upon granting a nonsuit, dismissing an action for damages. Affirmed.

*Fred B. Morrill,* for appellant.

*A. C. Spencer* and *Hamblen & Gilbert,* for respondent.

BRIDGES, J.—This was a suit to recover the value of three horses which were killed while engaged in the performance of some work for the defendant. When the plaintiff had introduced his testimony, the court granted a nonsuit and entered judgment dismissing the action.

The appellant's testimony shows the following facts: The respondent has and operates what has been termed its Amwaco branch line railroad, in the state of Idaho.

[1]Reported in 206 Pac. 939.

Amwaco is the present terminus of this branch line. For a considerable distance before reaching that place, it skirts along an arm of lake Coeur d'Alene. Generally speaking, throughout this distance, on one side of the railroad, there is a precipitous descent to the lake, and on the other side are high embankments. On the 7th of September, 1920, J. J. Nichols (for whom appellant Fraser is receiver) and the respondent entered into a written contract whereby Nichols agreed to furnish ten teams of horses and ten drivers therefor, and certain plows, scrapers, and other tools and equipment for the purpose of excavating ditches along the tracks of the railroad mentioned. This work was to be done under the general supervision of one of the respondent's division engineers. The contract further provided that Nichols should hire, pay, direct and discharge his employees, while in the prosecution of the work, and that his relations with the respondent should in all respects be that of an independent contractor. By virtue of this contract, Nichols furnished the teams and their drivers and other equipment, and began the work in the early part of September. Nichols placed his camp near Amwaco because of inability to place it along the track. In going from the camp to work and from work to the camp it was necessary to drive the teams on the railroad. One Kittelson was the driver of the team of horses which was killed, as hereinafter mentioned. He had been on the job for about a week and was perfectly familiar with all of the conditions under which the work had to be performed. He knew that a passenger train passed along the portion of the track in question about ten o'clock in the forenoon of each day on its way to Amwaco, and that a few minutes thereafter the same train came back. He also knew that another train made the same trip about the middle of each afternoon.

One forenoon, after this driver had been on the job about a week, one of his horses broke its harness, and the respondent's representative on the job told him to go to camp and have the harness fixed. In order so to do he had to, and did, drive his team down the railroad track for about two miles to the camp. After reaching the camp he had the harness mended, and, a little before ten o'clock, he started back to the work, driving his team along the railroad track. The distance he had to go was about two miles. Before he reached the place where they were working, the morning train on its way to Amwaco suddenly appeared around a curve, and, before it could be stopped, it ran into the horses, which, because of the nature of the ground, could not be gotten off the track. Both horses were killed. The driver did not know the train was approaching until he heard its whistle a short distance away. He testified that, when he started back from the camp after having fixed the harness, he knew that the forenoon train had not gone to Amwaco. A portion of his testimony is as follows:

"Q. Did you think a train might come along while you were going down there (to the place where they were working)? A. No, sir. Q. Did you think anything about that? A. No, sir. . . Q. Did you think you had time to go back to where you were working before the train arrived? A. Yes, sir. Q. Or did you think anything about it, as a matter of fact? A. I didn't think the train would be there yet, and I thought may be I could get back. . . Q. You just thought you would take a chance of the train not coming while you were driving on the track, is that it? A. I didn't think of it. Q. Didn't think about it at all? A. No. . . . Q. Were you on the lookout to see if any train was coming, or were you not thinking about it? A. I was not thinking anything about it."

This driver was the servant of Nichols and the latter, of course, was responsible for his negligence. Un-

der ordinary circumstances, we would be required to hold, as a matter of course, that the injury to the horses was the direct result of the negligence of the driver. But appellant seeks to avoid this conclusion because he says that the driver, in going to the camp and returning to the work, was acting under the orders of the respondent's representative, and that, under those circumstances, he had a right to expect that the respondent would protect him against any danger from approaching trains. In other words, appellant seeks reversal of this case on the well known proposition of law that a servant, in obeying the order of the master, is excused from what, under ordinary circumstances, would be his own negligence, unless the danger of complying with the order of the master was so manifest and imminent that no reasonable man would, under the same circumstances, obey the order.

We pass the question as to what effect the fact that the appellant was an independent contractor might have on the result of the suit, and go at once to an examination of the grounds upon which he seeks reversal. Appellant cites and quotes from a number of cases to the effect that, where the master orders the servant to do a certain thing, the latter has a right to assume that the former will not expose him to unnecessary peril, and to rest upon the assurance that there is no danger which is implied by the order. It is clear to us that the rule contended for cannot be applied to the facts of this case. Here respondent's engineer told appellant's driver to take his team to camp, about two miles away, and have the harness fixed. Nothing was said about the manner of complying with this order, nor when the driver would return to the work. The general rule is that a servant who, while obeying the master's order, is injured because of some act of positive negligence on his own part, which is in no wise the

proximate result of the order, cannot rely on the master's order to relieve him from the effects of his own negligence. Here the act of the driver in bringing his team along the railroad track when he knew, or should have known, that he would meet a train, was not an act performed in compliance with the direction of the respondent's representative. The driver was told what to do—not how to do it. If a servant, being told to do a certain thing, does it in a negligent manner, the master is not liable. This principle of law must control this case.

"The doctrine (of obeying a command) discussed in the present chapter is a protection to the servant *pro tanto,* only in so far as it relieves from the charge of culpability in the actual undertaking of the work which he was ordered to do. It does not relieve him of the duty of avoiding particular danger. The necessary connection between the order and the act of the servant is not established, where the injury occurred owing to the manner in which the servant executed a general order which left him free to choose his own methods of carrying it out, and which might, so far as appears, have been safely performed by the selection of a different method. Hence, a servant who relies on the orders of his superior as an excuse for pursuing a dangerous course of conduct must show, not merely that he was ordered generally to go to work, but that he was ordered to pursue that particular course of conduct." 4 Labatt, Master & Servant (2d. ed.), § 1368.

See, also, *Illinois Car & Equipment Co. v. Walch,* 132 Ala. 490, 31 South. 470; *Dallemand v. Saalfeldt,* 175 Ill. 310, 51 N. E. 645, 67 Am. St. 214, 48 L. R. A. 753, and note thereto.

We must hold that the killing of the horses was the direct result of the appellant's driver's negligence, and that the command given by respondent's representative was in no way connected with such negligence and cannot excuse it.

In a second cause of action the appellant sought to recover the value of another horse, which was injured while attached to one of the scrapers doing the work. It appears that at this particular time some six or eight teams and scrapers were carrying material from one place on the right of way to another in order to fill a hole; that these horses were all driven by the employees of the appellant; that one of the respondent's employees handled the scraper at the place where it was filled, and another handled it at the place where it was dumped. The usual way of dumping the scraper was for the person having hold of it to lift up on the handles; that action would cause it to turn and dump itself. While this was being done, in some way the scraper hit one of the horses and they started to run away. In so doing, a sharp portion of the scraper so injured the hind leg of one of the horses that the animal had to be killed. The testimony does not show just how this accident happened, other than as above indicated. There is nothing to show that respondent's servant, in dumping the scraper, did anything unusual or was guilty of any negligence. About all that is shown is that the accident happened, and courts cannot give judgment on testimony of that character. The trial court was right in granting the nonsuit. Judgment affirmed.

PARKER, C. J., FULLERTON, TOLMAN, and MITCHELL, JJ., concur.