Argued 28 January, decided 1 March, 1904.

**RINGUE v. OREGON COAL CO.**

[75 Pac. 703.]

MASTER AND SERVANT—BURDEN OF PROVING SUCH RELATIONSHIP.

1. In actions depending on the relationship of master and servant, where such relationship is denied, the burden is on plaintiff to show such facts as to create the relation of master and servant, under the law of negligence.

EVIDENCE AS TO EMPLOYMENT.

2. In an action for injuries to an infant working in a mine with his father, in order to establish the relationship of master and servant between plaintiff and defendant mine operator, it was not necessary for plaintiff to prove a direct contract of employment by some authorized agent of defendant, or that his right to work in the mine was included in the terms of the contract with his father, but evidence that he was going into the mine, at the time of his injury, by the request of his father, and with the express or implied consent of defendant, for the purpose of performing work or labor for defendant, was sufficient to show him a servant of defendant, within the rule requiring a master to exercise reasonable care to prevent injury to his employés.

CURING WRONG INSTRUCTION BY A CORRECT ONE.

3. Instructions to a jury should be harmonious and consistent, so that a charge may not be misunderstood, owing to the influence of another and incorrect charge. This rule is aptly illustrated here: In an action for damages by one claiming as a servant, an error in instructing that the right to recover depended on the existence of a contract of employment between the injured minor boy and the defendant, or between the boy's father and the defendant, is not cured by another charge that if the boy when injured was passing through the gangway where the accident occurred, by his father's request, on the way to work with him, and with defendant's consent, it was the duty of defendant to exercise due care to avoid unnecessary danger to him by defects in the roof, for this will be taken with the prior requirement that there must have been a contract, and the two charges are inconsistent and confusing.

WAIVER OF CUSTOM.

4. A custom concerning the manner of hiring employés is not conclusive as to

the fact of employment in a given instance, for the custom may have been waived, or some other method of employment may have been also used.

INSTRUCTIONS MUST BE LIMITED TO THE FACTS.

5. Instructions to juries should not refer to issues of fact not presented by the evidence.

QUESTIONS OF FACT ARE FOR JURY.

6. Disputes as to facts, for instance, as to the meaning of specified acts or conversations, should be left for the consideration of the jury.

From Coos : JAMES W. HAMILTON, Judge.

Action by Louis Ringue, acting through a guardian *ad litem*, against the Oregon Coal & Navigation Company, resulting in a verdict and judgment for defendant.

REVERSED.

For appellant there was a brief over the names of *Edward B. Watson, C. Henri Labbe*, and *A. J. Sherwood*, with an oral argument by *Mr. Watson* and *Mr. Labbe*.

For respondent there were briefs and oral arguments by *Mr. Jos. W. Bennett* and *Mr. J. S. Coke*.

Mr. Justice BEAN delivered the opinion of the court.

This is an action by Louis Ringue, by his guardian *ad litem*, against the Oregon Coal & Navigation Company, to recover damages for an injury alleged to have been caused by the negligence of the company. The complaint is, in substance, that on and prior to November 21, 1901, the plaintiff, a minor fourteen years of age, and Julien Ringue, his father, were employed in defendant's mine in Coos County as common laborers, engaged in mining coal and loading it in cars, for which the father received one dollar per ton ; that on the day named, while the plaintiff was going to the place of his work, a portion of the roof of the gangway along which he was passing fell, owing to the neglect and carelessness of the defendant, and injured him. The answer admits the accident to the plaintiff, but denies his employment by the defendant and the negligence charged. For affirmative defenses it alleged (1) that plaintiff was not in the employ of the defendant at

the time of the accident, but was wrongfully in the mine, without the knowledge or consent of the defendant, and contrary to its directions; (2) that the gangway where the accident occurred was constructed by competent and skillful men, in a good and workmanlike manner, and was continuously and daily inspected by skillful employés of the defendant, who were unable to ascertain any defect therein; (3) that there were three other and additional gangways which the plaintiff could have used in going to the place or room where his father was at work, but, instead of doing so, he wrongfully stopped, loitered, and played in the gangway where the injury occurred; and (4) that plaintiff's father was a competent and skillful miner, and had for many months prior to the accident passed daily through the gangway, and both he and the plaintiff understood the manner in which it was constructed, and thoroughly knew and appreciated whatever risk or danger there was in using it, and, as a consequence, they ought not to be heard to allege that it was an unsafe place through which to pass, or that defendant should be held responsible for the accident.

The testimony on the trial tended to show that for several years prior to the accident the plaintiff's father had been working for the defendant as a coal miner, receiving as a compensation one dollar a ton for all coal mined and loaded on the cars; that it was a custom or practice for fathers employed by the defendant, who desired to have their minor sons assist them at their work, to obtain from the bookkeeper an order on the blacksmith for a half set of tools, and to request the underground boss to furnish an extra car for the boy; that for some time before the accident the plaintiff, at the request of his father, and with the knowledge and acquiescence of the officers of the company, assisted his father in his work, and the company furnished extra cars for his use, and paid the father for

his services; that, as he was going to the place of his work on the morning of the accident, a section of the roof of the gangway through which he was passing fell and injured him. There is no evidence of any direct contract of employment of the plaintiff by the defendant, or that his father obtained an order from the bookkeeper on the blacksmith for tools for him. It was in evidence that about eight or ten days before the accident the plaintiff's father complained to the superintendent, and also to the underground boss, that he and his son were not getting sufficient cars, and was told by them to take the boy out of the mine, because, "there were not cars enough for the miners." This was not done, however, and the evidence tended to show that the plaintiff worked as usual from that time until the accident, and the defendant continued to furnish cars for him and his father, and to receive and accept the benefit of his services.

The court, in its instructions, stated that one of the material issues in the case was the alleged employment of the plaintiff by the defendant; that upon such issue the burden of proof was with the plaintiff, and he must show an employment before he could recover. Upon this point it charged the jury that if they found from the evidence "that plaintiff's father was employed by the defendant, and, by the terms of such employment, plaintiff was to assist the father in such work, and plaintiff entered the mine under such employment, and with permission of defendant, it would be the duty of the defendant to exercise reasonable care in maintaining a place for his work," etc.; that, if there was an employment of the plaintiff by the defendant, and "the accident occurred through some defect in the mine, which the defendant should have provided against," etc., it would be necessary for them to ascertain the amount of damages suffered by the plaintiff; that, if the plaintiff was not rightfully in the mine at the

time of the accident, he could not recover, because in such case the defendant would not be required to furnish him a safe place "in which to work, or through which to pass to his work. That relationship and duty would only exist in case plaintiff was employed by defendant"; that if the plaintiff was in the gangway of the defendant at the time of the accident, "without first having obtained its consent for that purpose," he was a trespasser, and could not recover; that if the plaintiff's father "applied to the defendant for leave to take his son into the mine," and "permission to do so was refused," the plaintiff had no right to go into the mine, and was a trespasser, to whom the defendant did not owe the duty of seeing that the place where he was injured was reasonably safe.

1. By these instructions the plaintiff's right to recover was made to depend upon his employment by the defendant, and the jury must necessarily have understood he was not entitled to recover unless there was an actual contract of employment, even though he may have been working at the mine at the request of his father, with the defendant's permission and consent, and for its benefit. The complaint proceeds on the theory that at the time of the accident the ralation of master and servant existed between the plaintiff and the defendant. This was denied, and was therefore a material issue in the case. The plaintiff must recover, if at all, upon the cause of action as alleged; and the burden of proof was upon him to show such a state of facts as, under the law of negligence, would constitute the relation of master and servant.

2. We do not understand, however, that it was necessary for him to prove a direct contract by some authorized agent of the defendant employing him, or that his right to work was included in the terms of the contract with his father. If, as the evidence tended to show, he was going into the mine at the time of the accident by the request

of his father, with the permission or consent of the defendant, express or implied, for the purpose of performing work or labor for it, he was not a trespasser or a licensee, but was rightfully in the mine, and the relation of master and servant existed between him and the defendant, within the meaning of the rule requiring a master to exercise reasonable care to prevent injury to his employés.

In *Tennessee Coal Co.* v. *Hayes*, 97 Ala. 201 (12 South. 98), the plaintiff's father was employed to load defendant's cars at a specified price per car. His minor son, while assisting him in his work by the direction and under the supervision of an agent of the defendant, was injured ; and it was held that the son was a servant of the defendant, although his name was not on its pay roll, and his father received the compensation for his services, the court saying : "The defendant had the benefit of plaintiff's labor thus induced and assented to by its authorized agent, and performed with his knowledge and under his supervision, if the facts be in line with this tendency of the evidence, which was a question for the jury. That this evidence, if believed, established the relationship of master and servant, within the meaning of the act referred to, between the defendant and the plaintiff, is, we think, clear. That plaintiff's name was not on defendant's pay roll, and that he personally received nothing from defendant for his labor, has no bearing on the question. He was a minor, and his father was entitled to his time and to the rewards of his labor. The payment of compensation for his services to his father was as if it had been paid directly to him, so far as the fact of payment bears upon the question of the relationship between him and the defendant corporation. Here, then, on this aspect of the evidence, we have an employment by the defendant in accordance with defendant's directions, and payment for that work, in legal effect, to the person employed, and who performed the

labor.   We do not conceive that any doubt can exist of
the jury's right to find that plaintiff was defendant's serv-
ant, and by such finding support the averments of the
complaint in this regard."   In *Rummell* v. *Dilworth,* 111
Pa. 343 (2 Atl. 355, 363), the plaintiff was injured in a
spikemill.   He was employed by a roller boss, and paid by
him, and the court said : "Whether he was directly in the
defendants' employ, or indirectly as the assistant of Rich-
ards, he may be treated as their employé.   He was engaged
in the work of the defendants, upon their machinery, and
the defendants were themselves operating the mill.   The
right of the roller boss to employ assistants is clearly shown,
and, as it does not appear that he was an independent
contractor, it is unimportant that the amount of his com-
pensation was measured by the number of tons manufac-
tured.   The plaintiff was not a trespasser.   He was in the
rightful discharge of the duties of a valid employment.
The relation of master and servant is fairly inferable from
the proofs, and the defendants are therefore bound to the
performance of all the duties, and are entitled to the pro-
tection which that relation affords."   To the same effect,
see *Indiana Iron Co.* v. *Cray,* 19 Ind. App. 565 (48 N. E.
803); *Neimeyer* v. *Weyerhauser,* 95 Iowa, 497 (64 N. W. 416);
*Wallace* v. *Southern Cotton Oil Co.* 91 Tex. 18 (40 S. W.
399); *Southern Cotton Oil Co.* v. *Wallace,* 23 Tex. Civ. App.
12 (54 S. W. 638).

Under the law, therefore, even though there was no di-
rect contract of employment, the plaintiff was entitled to
the protection of a servant, if, with the knowledge and con-
sent of the defendant, he was in the mine for the purpose
of rendering services for its benefit, and the case should
have been submitted to the jury upon that theory.   The
instructions as given, however, were to the effect that
plaintiff could not recover unless he was actually employed
by the defendant, or was authorized, under the terms of

his father's employment, to work for it. It is stated in one of the instructions that the duty of the defendant to exercise reasonable care, and to furnish the plaintiff a reasonably safe place in which to work, would "only exist in case plaintiff was employed by the defendant," and in another that if, by the terms of the contract under which the father worked, plaintiff was to assist him, and entered the mine under such arrangement, with the permission of the defendant, it would be its duty to exercise reasonable care to provide him a reasonably safe place in which to work. His right to recover was thus made to depend upon the existence of a contract of employment, either directly with himself or through his father, while, as we have seen, he was entitled, under the law, to the protection of a servant if he was in the mine, with defendant's consent, for the purpose of performing labor or services for its benefit; and hence there was error in the instructions.

3. Nor was the error caused by an instruction given at the request of the plaintiff to the effect that if, at the time of the accident, plaintiff was passing through the gangway by his father's request, going to the place where his father was at work to assist him, with the permission or consent of the company, it would be the duty of the defendant to exercise due care and diligence and to take suitable precautions to avoid any unnecessary danger to him by reason of a defect in the roof of the gangway. This instruction, standing alone, may state the law correctly as applicable to the facts; but it must be taken in connection with the other instructions, and thus understood as meaning to define the rights of the plaintiff and the duties of the defendant in case the jury should find that there was an actual contract of employment.

4. It was suggested at the argument that the relation of master and servant did not exist between the plaintiff and the defendant, because there was no evidence show-

ing that plaintiff's father applied to the bookkeeper of the defendant for an order for tools for his son before taking him into the mine, but this does not necessarily affect the relationship of the parties. The custom requiring a father employed by the defendant, who desired to take his son into the mine to assist him, to apply to the bookkeeper for an order on the blacksmith for tools for the son, was a mere regulation of the company, which could be waived by it, and the evidence tends to show such to have been the case.

5. The instruction that if plaintiff's father applied to the defendant for leave to take the boy into the mine to assist him in his work, and was refused, the plaintiff could not recover, is, as we understand the record, outside the testimony. There is no evidence that the father ever applied to any officer of the company for that purpose, but, on the contrary, the superintendent, who alone had authority to hire employés, testified that the plaintiff's father never made any such application.

6. In taking the boy into the mine, the evidence tended to show that he was merely following a practice or custom which prevailed, and to which the defendant gave its sanction and consent. The instruction was, no doubt, intended to refer to the alleged conversation between the father and defendant's superintendent and underground boss a few days before the accident about the shortage of cars. The father was not at that time applying for leave to take the boy into the mine. He had already been working, as the evidence tended to show, with the knowledge and under the direction of the defendant, for some time, and the father was merely complaining because he did not receive sufficient cars for himself and son. Whether the statements of the officers of the company at the time amounted to a discharge of the boy, or a refusal to allow him to work longer in the mine, or were merely intended as an excuse

for not furnishing cars, was a question of fact for the jury.

The defendant insists that, nothwithstanding any errors which may appear in the record, the judgment should be affirmed, because the accident to the plaintiff was not due to the negligence or carelessness of the defendant, and that plaintiff was himself guilty of contributory negligence. The first point is disposed of by the fact that the bill of exceptions does not purport to contain all the evidence, and the second was a question for the jury. The judgment is reversed, and a new trial ordered.     REVERSED.

---

Decided 15 June, 1903, decided on rehearing 11 January, 1904.