CASE 72.—ACTION BY J. E. PENDLETON'S ADMINISTRATOR AGAINST THE LOUISVILLE & NASHVILLE R. R. CO. FOR DAMAGES FOR CAUSING THE DEATH OF PLAINTIFF'S INTESTATE.—October 11.

# Louisville & N. R. R. Co. v. Pendleton's Admr.

126 605
e130 187
133 843

Appeal from Todd Circuit Court.

W. P. SANDIDGE, Circuit Judge.

Judgment for plaintiff, defendant appeals.—Reversed.

1. Master and Servant—Nature of Relation.—The relation of master and servant is created by contract, and imposes reciprocal rights, duties, and obligations.

2. Same—Duty to Furnish Safe Appliances and Place for Work.—It is the duty of the master to provide reasonably safe premises and appliances for the servant's use.

3. Negligence—Care Required as to Trespassers.—A trespasser or volunteer, who is injured, cannot recover from the owner of the premises, unless the injury is inflicted after his peril is discovered.

4. Master and Servant—Injuries to Servant—Deviation from Regular Employment.—Where a person employed by a railroad as car inspector voluntarily undertook, without authority, the work of assisting a switching crew, the relation of master and servant was temporarily suspended.

5. Same—Creation of Relation—Implied Contract.—The mere knowledge and implied consent of an agent in charge of railroad yards, who saw an employe of the company leave his regular employment as car inspector and assist a switching crew, did not create by implication of law the relation of master and servant between the employe and the company while he was engaged in that work.

BENJAMIN D. WARFIELD, Attorney for appellant.

PERKINS & TRIMBLE, of counsel.

## POINTS DISCUSSED AND AUTHORITIES RELIED ON.

1. Evidence examined to show that decedent was employed and paid to work in an entirely separate and distinct department of appellant's service from that in which he was injured while doing a reckless, needless, and wholly voluntary thing. He was a trespasser and it is in that light that this case must be viewed. The trial court ruled otherwise, and hence the judgment is erorneous. L. & N. R. Co. v. Gastineau's Adm'r, 83 Ky. 119; Ib. v. Webb, 99 Ky., 332; C., N. O. & T. P. Ry. Co.'s Receiver v. Jackson, by etc., 22 Ky. Law Rep., 630; McDermott, by etc., v. K. C. R. R. Co., 93 Ky., 408; L. & N. R. Co. v. Hocker, 111 Ky., 707; I. C. R. Co. v. Broughton, 25 Ky. Law Rep., 1752; K. C. R. Co. v. McGinty, 9 Ky. Law Rep., 288; Dalton's Adm'r v. L. & N. R. Co., 22 Ky. Law Rep., 97; L. & N. R. Co. v. Thornton, Ib., 778; Monehan v. S. C. & C. St. Ry. Co., 117 Ky., 771.

2. The court erred in admitting incompetent and prejudicial testimony. L. & N. R. Co. v. Malloy's Adm'r, 28 Ky. Law Rep., 113; Ib. v. McClish, 115 Fed., 268, and cases there cited; Lexington Ry. Co. v. Herring, 28 Ky. Law Rep. 794, 96 S. W. 558, and cases there cited.

3. Decedent was a volunteer in the performance of a service unauthorized by his employment, therefore as between appellant and its servants who conducted the switching movements which caused decedent's injury the doctrine of respondeat superior does not apply, and a recovery is barred upon the principle of fellow-servants or that of common employment. Hatfield v. Adams, 29 Ky. Law Rep. 880, 96 S. W. 583.

4. Decedent's contributory negligence should bar a recovery; and the court should peremptorily have instructed the jury to find for appellant. L. & N. Co. v. Mounce's Adm'r, 28 Ky. Law Rep., 933; South Covington, etc., St. Ry. Co. v. Pelzer, 115 Ky., 883-889; L. & N. R. Co. v. Hocker, supra; Favre v. L. & N. R. Co., 91 Ky., 541; P. & M. R. Co. v. Hoehl, 12 Bush, 41-45; Ramsey v. L., C. & St. L. R. Co., 89 Ky., 99-102; I. C. R. Co v. Dick, 91 Ky., 434-441; C., N. O. & T. P. R. Co. v. Finnell's Adm'r, 22 Ky. Law Rep., 86, and L. & N. R. Co. v. Earl's Adm'r, 94 Ky., 368, distinguished.

5. The instructions were erroneous and prejudicial . L. & N. R. Co. v. McCombs, 21 Ky. Law Rep., 1232; Ib. v. Hurt, 116 Ky.,

Louisville & N. R. R. Co. v. Pendleton's Adm'r.

on p. 553; Engmann v. Estate of Immel, 59 Wis., 249; Kavanaugh v. Wilson, 70 N. Y., 177-9; Robertson v. Dodge, 28 Ill., 161-3; Evans v. George, 80 Ill., 51-3; Denton v. Carroll, 4 N. Y. App. Div., 532, 40 N. Y. Supp. 19.

PETRIE & STANDARD, attorneys for appellee.

POINTS DISCUSSED AND AUTHORITIES RELIED ON.

1. The evidence in this case shows the decedent, Pendleton, from the summer or early fall of 1904, until the time of his death, in February, 1905, was engaged in assisting the switching crew in the yards at Guthrie, Ky., under the direction and supervision of H. C. Anderson, foreman of the switching crew, and with the knowledge of J. L. Cash, general agent of the company at Guthrie, and that he engaged in this work to such an extent that he could not be distinguished, by reason of work performed, from any other member of the crew.

2. Decedent, at the time of his death, was not guilty of contributory negligence, but appellant was guilty of inexcusable negligence, which resulted in the death of decedent. Louisville & Nashville R. R. Co. v. Earl's Adm'r, 15 Ky. Law Rep., 186.

3. In this case it was a question for the jury to decide whether decedent at the time he was killed was acting outside the scope of his employment, or whether he was, at the time, engaged in switching cars for the railroad company, with the consent and approval of the agents of the company in control of said work of switching and in control of the men engaged therein. Labatt on Master and Servant, vol. 2, p. 1867; I. C. R. R. Co. v. Timmons, 30 Ky. Law Rep (not yet reported in Ky. Law Rep.); Rummell v. Dilworth, Porter & Co., Am. St. Rep., vol. 17, 827; Delleman v. Saalfeldt, 67 Am. St. Rep., 214.

4. The railroad company having accepted the service of decedent as switchman, he should be regarded as an employee while working in this capacity and not as a volunteer. Am. & Eng. Encyc. Law, vol. 14, pp. 751 and 876; Labatt on Master and Servant, vol. 2, pp. 1863, 1864, 1867, 1868; Collins v. C., N. O. & T. P. R. R. Co., 13 Ky. Law Rep.,670 ; Cumberland Tel. & Tel. Co. v. Adams, 28 Ky. Law Rep., 1265; Rummell v. Dilworth, Porter & Co., 17 Am. St. Rep., 827; Witkowski v. Geo. W. Carter Sons Co., 70 N. Y. Supp., 32; Mullens v. N. W. Mill Co., 55 N. W., 1115; East Line & R. River R. R. Co. v. Scott, 5 S. W. R., 501; Johnson v. Ashland Water Co., 5 Am. St. Rep., 243; Consolidated Coal Co. v. Bruce, 150 Ill., 454; Dellemand v. Saalfeldt, 67 Am. St. Rep., 214; Fitzhenry v. Lamson, 45 N. Y. Supp., 875.

Louisville & N. R. R. Co. v. Pendleton's Adm'r.

5. Evidence as to previous work done by decedent as switchman was proper and competent. Labatt on Master and Servant, vol. 2, 1868; Collins v. N. O. T. P. R. R. Co., 13 Ky. Law Rep. 670.

6. J. L. Cash and H. C. Anderson were, at the time of the injury and prior thereto, agents of the railroad company at Guthrie, Ky., the former being general agent at said point with complete control over the switching operations, and the latter being foreman of the switching crew, and each had both express and implied authority to accept the services of deceased with the switching crew. N. N. & M. B. Co. v. Carroll, 17 Ky. Law Rep., 374; L. & N. R. R. Co. v. Willis, 6 Ky. Law Rep., 784.

Reply brief by SELDEN Y. TRIMBLE, for appellant.

POINTS AND AUTHORITIES.

1. Incompetent evidence. L. & N. R. R. Co. v. Webb, 99 Ky., 332; Jackson's Adm'r v. L. & N. R. R. Co., 28 Ky. Law Rep., 311; L. & N. R. R. Co. v. Fox, 11 Bush, 505; 21 Encyc. of Law (new), p. 513; Labatt on Master and Servant, p. 2280.

2. An express contract necessarily excludes the idea of an implied contract. 15 Encyc. of Law (new), p. 1078; Walker v. Brown, 81 Am. Dec., p. 287; Fonda v. Smith, 5 Ky. Law Rep., 853; Pringle v. Samuels, 1 Bibb., 172; Coffman v. Allin and wife, Litt. select Cases, 200.

3. Appellee's decedent was a trespasser, a volunteer—at best a mere licensee; appellant owed him no duty except the exercise of ordinary care to avoid injurying him after its discovery of his peril. The court should have given a peremptory instruction at the close of plaintiff's evidence, and certainly at the close of all the evidence. 20 Encyc. of Law (new), p. 154; Labatt on Master and Servant, vol. 2, section 629; K. C. R. R. Co. v. Gastineau's Adm'r, 83 Ky., 119; K. C. Ry. Co. v. McGinty, 9 Ky. Law Rep., 288; McDermott, etc., v. K. C. Ry. Co., 93 Ky., 408; L. & N. R. R. Co. v. Webb, 99 Ky., 332; C., N. O. & T. P. R. R. Co. v. Jackson, 22 Ky. Law Rep., 630; L. & N. R. R. Co. v. Thornton, 22 Ky. Law Rep., 778; L. & N. R. R. Co. v. Hocker, 111 Ky., 707; Cook v. L. & N. R. R. Co., 24 Ky. LawRep., 1967; I. C. R. R. Co. v. Broughton, 25 Ky. Law Rep., 1752; Shadoan's Adm'r v. C., N. O. & T. P. R. R. Co., 26 Ky. Law Rep., 828; Hatfield v. Adams, 29 Ky. Law Rep., 880.

4. Appellant is not liable for the negligence of decedent's fellow servant.

OPINION OF THE COURT BY JUDGE CARROLL.—Reversing.

J. E. Pendleton, while engaged in assisting a switching crew, was killed by being crushed between two cars. In this action his administrator recovered $5,000 for the destruction of his life. A reversal is asked for several alleged errors committed by the trial court.

To understand fully the questions involved, it will be necessary to relate with some particularity the facts exhibited by the record. Pendleton, who was about 22 years of age, was first employed in November, 1904, by appellant as a yard clerk in its yards at Guthrie, Ky. He remained in this branch of the service until January, 1905, when he was transferred to the car inspector and repair department, and worked there until his death on February 6, 1905. His duties as yard clerk and in connection with the inspector and repair department did not require him to do anything with reference to the switching or shifting of cars in the yard, or to assist in any way the switching crew; and it is conceded that he was never employed as a member of the switch crew. Previous to his engagement by appellant, and during the time he acted as yard clerk and worked in the inspector and repair department, he was endeavoring to fit himself for the position of brakeman, and had quite a desire to get this place. Frequently, while acting as yard clerk and inspector, he assisted the switching crew in their work, throwing switches, giving signals to the engineer, riding the cars—in fact, doing everything that the regular switching crew did. There is evidence that he did this with the knowledge

and at least implied consent of the person in charge of the yard and in charge of the switching crew. On behalf of appellant the evidence upon this question is in effect that, although its agent in charge knew Pendleton often assisted the switching crew in the performance of the duties before mentioned, he had frequently requested him not to do so, calling his attention to the dangerous nature of the employment. The foreman under whom he worked as assistant inspector and car repairer testified that his duties in this department required his attention from 7 o'clock in the morning until 6 in the afternoon, although it often happened that for a short time during these hours there was no work necessary to be done in that department. Pendleton was killed at 5 o'clock in the afternoon, and immediately before this was engaged in his duties as car inspector with Anderson, his foreman. Anderson testifies that, when Pendleton left at 5 o'clock to assist the switching crew, he needed his services, and so informed him, but, notwithstanding this, he went to where the switching crew was at work, doubtless expecting to return to Anderson in a short while. Several days before February 6th a car loaded with coal had been placed on a coal track, adjacent to a coal yard, to be unloaded, and after being unloaded it was permitted to stand for about four days on the coal yard track, so close to the passing track used for switching purposes that a person riding on the ladder on the side of a car on the passing track would be struck by the car on the coal track, although there was room for the cars to pass. On the evening Pendleton was killed the switching crew was engaged in putting ten cars on the passing track. To do this the cars were run by the coal track on which the empty coal car was standing. The switch crew

consisted of an engineer, fireman, conductor or fore-
man, and two switchmen. These composed the full
crew. Five of the cars were first put on the passing
track; Pendleton being with the crew. These five cars
were left on the passing track by the engine, and it
went back to get the other five. After connecting with
the last-named five cars, Pendleton threw the switch
to permit the engine to take the cars on the track
where the first five had been placed; and after throw-
ing the switch, which was close by and in plain view
of the car standing on the coal track, he jumped on
one of the cars being pushed by the engine, putting
his feet in the stirrup on the bottom of the side of
the car, and holding onto the ladder attached to the
side of the car, placed there for the purpose of
enabling employes to get from the ground to the top
of the car. While thus riding on the side of the car he
was struck and almost instantly killed by coming in
contact with the empty coal car standing on the coal
track as the car on which he was riding passed it.
When Pendleton jumped on the car, as it was passing
the switch he had opened, it was running about eight
miles an hour. It does not appear that the engineer
or any of the switch crew knew that he was going to
get on the car; but the engineer saw him a moment
after he had climbed on the side of it, and, knowing the
proximity of the empty car to the passing track and
the perilous position that Pendleton was placed in,
applied his emergency brake and did everything
possible to stop; but he was unable to stop the
cars until after Pendleton had been struck. We
may remark in passing that no blame is attached to
the engineer or any of the switch crew. The negli-
gence complained of is in permitting this empty car
to remain standing for several days so close to the

passing track as to endanger the life of a person who might be riding on the side of a car running on the passing track. There being evidence to show that it was usual and customary for the switch crew to ride in the manner in which Pendleton was riding, the contention of appellee is that Pendleton, considering all of the facts and circumstances proven in the case, is entitled to be treated as if he were a member of the switch crew.

The real issue in the case, and the one to which counsel have especially addressed themselves, may be thus stated: For appellee it is said that as Pendleton, with the knowledge and implied consent and approval of the person in charge of the yard, was permitted to frequently perform the duties of a switchman, such as throwing switches, giving signals, and riding cars, the company owed to him the same duty that it did to a regular member of the switching crew. The company's argument, supported by the testimony introduced by it, is that Pendleton was employed in a different department of its service; that he had no duties to perform in connection with the switching crew; that although he was at times, with the knowledge and apparent consent of the person in charge of the yard, permitted to assist in the performance of these duties, he did so without his approval and in opposition to his direct commands; and hence he is to be treated as a trespasser or volunteer, and the company cannot be held responsible for his death. It is further urged that his duties as car inspector and repairer demanded his attention and service from 7 a. m. to 6 p. m., and that during these hours he should have remained at the place where the performance of his duties required him to be. It may safely be said, and for the purpose of this

case we will assume, that the evidence establishes that Pendleton did, with the knowledge and at least implied consent of appellant's agent in charge of the yard, although not by his request or direction, often assist in switching cars and perform all the other duties incident to the work of a switchman, and that when killed he was so engaged; that in throwing the switch, immediately before he jumped on the car that carried him to his death, the agent in charge of the yard was not present, nor was the foreman of the switching crew; nor did either of them have any knowledge that he was going to throw the switch or ride the car. And in considering the case we will treat it as if the agent of appellant in charge of the yard had the right to employ switchmen and to control their movements; in fact, that he was, in respect to everything done by employes of the company in and about the yard, the respresentative of the company, conpetent to charge it with his acts. We will also assume that if the relation of master and servant existed between the company and Pendleton—in other words, if he is to be deemed a brakeman—it was guilty of such negligence in permitting the car on the coal track to remain so dangerously near the passing track as to render it liable in damages for his death. So that the issue narrows down to the proposition, squarely put: Did the relation of master and servant exist between Pendleton and appellant at the time of his death, or was he then a mere trespasser or volunteer? Upon the correct determination of this question depends the result of this case, and we will endeavor to solve it by applying the law as we understand it to the facts as herein stated.

The relation of master and servant is created by contract, either express or implied. It imposes recip-

rocal rights, duties, and obligations. As a part of the duties growing out of this contractual relation the law imposes on the master the obligation of providing reasonably safe premises and reasonably safe appliances for the use of the servant; and if delinquent in these respects, and the servant is injured thereby, the master may be compelled to respond in damages for his breach of duty. This relation cannot be created by one of the parties. The assent of both, either express or implied, is necessary. A person cannot impose on another the responsible obligation resting upon a master without the participation of such other person. The law, in the absence of some contractual arrangement or agreement, express or implied, will not create the relation of master and servant. The trespasser or the volunteer. who is injured in or about the performance of labor that he undertakes, cannot look to the owner of the premises to compensate him for the injury or damage, unless it is inflicted after his peril is discovered. And when a person employed to perform certain services goes entirely without the line of his duty and assumes the performance of other labors for his master, without his direction or authority, he occupies no better position than if the relation of master and servant did not exist in respect to any employment between them, as, when the master engages a servant to perform specified service, he is only responsible to him for some breach of duty committed within the scope or limits of the employment for which the servant has been engaged. Thus, in Thompson on the Law of Negligence, section 4677, it is said: "An employe, who undertakes without the order or request of his employer, or the representative of the employer, or contrary to his orders, or in compliance with the

orders or request of another employe who has no authority from the employer to give such orders or to make such request, to perform work outside the scope of his employment or upon dangerous premises, where the terms of his employment do not require him to do or be, * * * is deemed to assume the risk attendant upon his voluntary undertaking, and cannot recover for injuries occasioned by any defect in the premises, machinery, or tools to which he thus voluntarily exposes himself. The reason of the rule is obvious. The master undertakes to exercise reasonable care to the end of keeping his premises, his machinery, his tools, and his appliances in a reasonable condition of safety for the protection of the servant employed in a stated service, and so long as he continues in that service. But, when he places himself outside the line of his duty, the relation of master and servant is deemed to be temporarily suspended. His position is then in all things that of a trespasser or bare licensee. The master owes him no duty to anticipate his deviation from his duty and the possible danger which may arise to him therefrom, and to provide against it. He takes things as he finds them, and suffers all consequences of his own error, and cannot make his master liable therefor. The law will not, on obvious grounds of justice, compel the master to pay damages which the servant has brought on himself by undertaking to do something which the master did not employ him to do, but will ascribe his calamity to his own unnecessary and gratuitous act." The same doctrine is announced in Labatt on Master and Servant, section 633, and approved in Louisville & Nashville R. R. Co. v. Hocker, 111 Ky. 707, 64 S. W. 638, 65 S. W. 119, 23 Ky. Law Rep. 982, 1274. Therefore, although Pen-

dleton at the time of his death was engaged by appellant as car inspector and repairer, and in this employment the relation of master and servant existed between them, with all its attending duties and obligations, yet it did not continue when without authority or direction he voluntarily undertook the performance of other duties entirely disconnected with those for which he was engaged. In performing these new duties, he occupied towards his employer or master the same relation as if he were an entire stranger. His attitude in assisting the switching crew was the same as if he had quit his work as clerk in a store or as laborer on a farm to undertake them.

The remaining question to be considered is: Did the fact that he assisted the switching crew, with the knowledge and implied consent of the agent in charge of the yard, have the effect of establishing for the time being the relation of master and servant between him and the person for whom he voluntarily assumed to work? In assisting the switching crew, he did not take the place of any member of that crew. His services were not needed. In helping them he was acting with a view to his own advancement, and endeavoring to become proficient as a brakeman and switchman; and in our opinion the relation of master and servant between Pendleton and appellant could not in this manner and under the facts of this case be created. Certain it is that he had never been employed as a member of the switching crew, nor had he ever been requested or directed by any person in authority to perform any of the duties in connection with it. The foreman of the crew had no authority to bind the company by his consent to or approval of Pendleton's service. He was under the control of the agent; indeed, strictly speaking, the right of employ-

ment was in the train dispatcher, under the rules of the company. He had his full complement of men. No emergency existed that made it necessary to obtain other assistance. Thompson on Negligence, sections 4982-4990. The mere knowledge, and we may assume implied consent and approval, of the agent in charge of the business, who looked on and saw decedent quite frequently assist the switching crew, did not have the effect of creating by implication of law the relation of master and servant, or convert him from a volunteer into a servant. We do not mean to say that this relation may not be created by an implied contract, as if a person authorized to employ labor should request or accept the needed service of a person who volunteered to perform it. But it would be announcing an unreasonable rule to declare that any person, who might choose, for his own instruction, entertainment, or benefit, to assist persons engaged in an occupation, might thus become in the eye of the law a servant entitled to demand and receive the protection accorded to persons that occupied that relation by virtue of rights growing out of contract. It is true that, if Pendleton's services were not needed or desirable, he could have been peremptorily ordered to absent himself from the yards, or, if necessary, could have been discharged from the employment of the company, or, indeed, in an extremity, might have been arrested for trespassing. But persons in the conduct of their business are not required to resort to these extreme measures to prevent men of intelligence and common understanding from volunteering in affairs about which they are not employed; nor is it necessary that they should do so to prevent a volunteer, trespasser, or intruder from creating the legal relation of master and servant. Intruders, tres-

passers, and volunteers assume the risk incident to
the unauthorized acts they perform; and, in dealing
with them in cases of injury, the law will not enforce
or apply the rules governing the relation of master
and servant, but only hold the persons accountable
for the injury to the duty of avoiding it, if they could
have done so by the exercise of ordinary care after
the peril was actually discovered. When Pendleton
left his employment as car inspector, and went to
assist the switching crew, he must be held to have
accepted conditions in the switching yards exactly as
he found them. As to him, the railroad company was
under no obligation to move the car causing his death;
nor can it be held liable for its negligence in per-
mitting it to remain there. It owed him no duty,
except to avoid injury after his peril was actually
discovered.

It would be difficult, and we will not attempt, to
lay down any fixed rule, or one of general applica-
tion, in the settlement of the intricate question as to
when persons not employed are to be treated as vol-
unteers or as servants. The conditions and circum-
stances under which volunteers perform services are
so varying that often, although beginning as volun-
teers, they may become for the time being servants,
entitled to protection the same as if regularly em-
ployed in the first instance. The books are full of
distinctions and differences, growing out of the facts
of each case as they are presented to the court. We
may, however, with no sense of uncertainty, say that
something more than mere knowledge of, and implied
consent to, occasional acts of service, in employments
like the one under consideration, will be required to
create the important relation of master and servant.
If the relation could be thus established, employers,

especially those engaged in large business interests, with widely separated agencies, operating under systems carefully planned and constructed to insure discipline, efficiency, and safety, and where each employe is selected with some reference to his fitness and qualifications for the service he is engaged to perform, would often find their business disarranged, their discipline interferred with, and their employes hindered and disturbed. Aside from this, they would be subjected to liabilities they had not contracted for, and could not well anticipate or guard against. In Labatt on Master and Servant, vol. 2, section 630, it is said: "A person cannot be subjected without his own consent or that of his agent, to the obligations which the law attaches to the contract of hiring." It must also be conceded that there is a wide difference between requesting or directing a person to work even for an hour or a few minutes, and merely permitting him to render desultory service that is not needed, although it may be accepted, and thus impliedly, at least, consented to. In the one instance the master has been consulted. He has exercised authority and discretion. In short, he had entered into a contract. In the other, he has merely submitted to interference by a volunteer upon his premises and permitted him to do things that were not helpful or necessary. And this distinction will be found running all through the cases on this subject. A formal or express agreement is not required, nor is it essential that compensation should be paid or expected from the one sought to be charged. Also, the relation may be implied from facts and circumstances surrounding the employment; but we will not, in the course of this opinion, undertake to say what facts might raise an implied contract, as it is not necessary to the decision

of this case that we should do so. Sufficient for the
questions before us is the statement that here the
facts do not warrant the conclusion that there was
an implied contract.

In Kentucky Central R. Co. v. Gastineau's Adm'r,
83 Ky. 119, 7 Ky. Law Rep. 17, Gastineau,
a boy between fourteen and fifteen years of
age, was run over and killed by a car of the rail-
road company which he was endeavoring to uncouple
from a train while switching in the company's yard.
In a special verdict the jury found that the deceased,
when killed, was voluntarily assisting the employes of
the road, with their knowledge and consent, in switch-
ing cars; that they discovered his peril too late to
prevent his death; and that he contributed to it by
his presence and offering to uncouple the car. In the
course of the opinion the court said: "The deceased
could not be regarded as a servant or employe of the
company at the time of his death. He did not in a
legal sense occupy that relation. and was to it a
stranger; and in this light the rights of the parties
must be viewed. A railroad company has a right to
the exclusive use and occupation of its yard and
track, except at crossings or such places as the public
are by law authorized to use. Otherwise, it could not
properly perform its duties to the public. It is not
required to anticipate the intrusion of others, and one
who enters upon them wthout right does so at his
peril, and in case of injury cannot recover, unless it
was wantonly inflicted after the danger was discov-
ered. * * * Without having in view for the present
the age of the deceased, we remark that the fact that
a mere employe knows of the presence of an inter-
meddler does not legalize it, and so place him as to
the company in its protection that it is bound to

anticipate and ascertain if he has placed himself in danger, instead of being merely bound to use reasonable care to avert it after its discovery. It has been held that even a request of one, being an employe of the company, to do some act connected with the management of a train, does not impose such a duty upon it or render the person less an intermeddler as to the company." This opinion was followed and approved in Monehan v. Covington St. Ry. Co., 117 Ky. 771, 25 Ky. Law Rep. 1920, 78 S. W. 1106; Illinois Central R. Co. v. Broughton, 78 S. W. 876, 25 Ky. Law Rep. 1752; L. & N. R. Co. v. Hocker, 111 Ky. 707, 23 Ky. Law Rep. 982, 1274, 64 S. W. 638, 65 S. W. 119; Hatfield v. Adams, 96 S. W. 583, 29 Ky. Law Rep. 880, 123 Ky. 428.

We have examined with care the authorities cited by appellee, but in none of them do we find anything in conflict with the principles heretofore announced. In Illinois Central R. Co. v. Timmons the principal question in the case was whether or not the person who employed Timmons had authority to do so; and this was the point in issue. In Collins v. C., N. O. & T. P. Ry. Co., 18 S. W. 11, 13 Ky. Law Rep. 670, Collins was injured by the explosion of a gas tank. One of the issues in the case was whether or not at the time he received the injury he was engaged in the business of the company. After stating the facts, the court said: "These facts plainly show that in the case of a fire upon appellee's premises it was the duty of deceased to aid in extinguishing it, and that in doing so he was acting as its employe." In Cumberland Telephone & Telegraph Co. v. Adams, 91 S. W. 739, 28 Ky. Law Rep. 1265, Adams was in the employment of the company as a groundman. On the evening he was hurt he was sent by the foreman with

his brother, Ed Adams, who was a lineman, to adjust some trouble which had occurred to the company's wires. When they arrived at the place, his brother ordered him to climb the pole and remedy the trouble. He did as directed, and in the performance of the duty was injured. The point was made that at the time he received the injury he was acting as a lineman, that being a different grade of employment from groundman, and hence he ought not to recover, as he was engaged in a service outside the line of his employment. The court said: "Now it is clear that whether appellee is called a lineman or groundman does not alter his right to recover in this action, if he was on the pole at the time of his injury in the performance of any duty he owed to appellant. If it be true, as he says, that Lee sent him to assist his brother, who, being a lineman, was his superior, and his brother told him to climb the pole, then he was in the performance of a duty owing to his employer. Of course, if he was a mere volunteer, who went up the pole without right or authority, then the company owed him no duty at all. We think it entirely immaterial whether appellee was technically a lineman or groundman. If he was a groundman, beginning to perform the duties of a lineman, and was in truth sent up the pole by his superior, then he was entitled certainly to no less protection, because of his want of experience, than if he had been a lineman, so experienced as to know better how to take care of himself. The whole question turns, not upon whether appellant was a lineman or groundman, but whether at the time he climbed the pole he was in the performance of a duty he owed to appellant company." In Johnson v. Ashland Water Company, 71 Wis. 553, 37 N. W. 823, 5 Am. St. Rep. 243, it is stated in the opinion that

"the plaintiff was engaged in the defendant's work at the request of a man in charge of the work, and although it may be said that his employment was for a mere temporary purpose, and that the plaintiff was not expecting any pay for the work done, and in that sense the work was volunteered, still, being in the defendant's employment and at the request of its servant or foreman, he was not a trespasser, and he was for the time being the servant of the defendant, and entitled to the same protection as any other servant of the defendant." In Dallemand v. Saalfeldt, 175 Ill. 310, 51 N. E. 645, 48 L. R. A. 753, 67 Am. St. Rep. 214, the servant was performing duties outside the scope of his employment, but by direction of a foreman. In Huntzicker v. Illinois Central R. Co., 129 Fed. 548, 64 C. C. A. 78, the injured person was learning the duties of brakeman by the written direction of the trainmaster. In Ringu v. Oregon Coal Co., 44 Or. 407, 75 Pac. 703, young Ringu, who was injured, was assisting his father in working in a mine. It was the custom, authorized by the company, to permit fathers to employ their sons, and for some time before the accident Ringu had been so working with the knowledge and consent of the company, and the company had furnished extra cars for his use and paid the father for his services. It will thus be seen that all of these cases are easily distinguishable from the one before us. Running through all of them will be found the proposition that the employment was by request, express or implied, and upon this assumption recovery was allowed. We have been unable to find any authority to support the position, taken by appellee, that the mere fact that Pendleton, with the knowledge and consent of appellant, rendered service to the

switching crew, had the effect of creating the relation of master and servant.

Our conclusion is that upon the facts presented by this record appellee was not entitled to recover. He was a mere volunteer, who placed himself in a position of danger. The railroad company owed him no duty, except to exercise ordinary care to avoid injury to him after his position of peril was discovered; and, as we have seen, there is no claim of negligence in this respect.

Wherefore the judgment is reversed, with directions for a new trial consistent with this opinion.