## Chesapeake & Ohio Railway Company v. Hudson.

(Decided April 21, 1916.)

### Appeal from Lewis Circuit Court.

1. Railroads—Injury to Volunteer Working on Car—Duty of Railroad Company.—Where a person, even though a volunteer or mere trespasser, goes upon a freight car to release its brake so it can be moved by a switch engine, and is thrown to the ground by a sudden lurch of the car, run over by it and injured, he being inexperienced and not knowing that the engine is pushing on the car at the time nor the danger in which he is placing himself, and the conductor, standing where he is all the time in full view both of him and the engineer, knows his inexperience and the danger, owes him the duty to use ordinary care to stop the engine, after discovering his peril, in time to prevent him from being injured.

2. Railroads—Injury to Person Working on Car—Negligence of Conductor.—In an action against a railroad company for damages resulting from the negligence of its conductor in failing to stop a switch engine in time to prevent plaintiff's injuries, after discovering his peril, while plaintiff was about to release the brake of a freight car, not knowing his danger or that the engine was pushing against the car, evidence examined and held to require submission to the jury on the question of the conductor's negligence.

WORTHINGTON, COCHRAN & BROWNING for appellant.

A. R. JOHNSON, PROCTOR K. MALIN and JOHNSON & JONES for appellee.

OPINION OF THE COURT BY JUDGE SETTLE.—Affirming.

This appeal is prosecuted from a judgment of the Lewis circuit court, entered upon a verdict awarding the appellee, Benjamin G. Hudson, $9,667.00 damages for the

loss of both of his legs, caused, as alleged, by the negligence of the servants of the appellant, Chesapeake & Ohio Railway Company, in charge of and operating an engine, tender and certain cars of one of its trains. Hudson was thrown from one of the cars, a wheel of which passed over him and so crushed and mangled both of his legs as to necessitate the amputation of one of them above the knee and the other just below the knee. Hudson being an infant, the action was instituted in his name and by John C. Queen as his next friend.

The accident occurred at a place in Lewis county known as Fire Brick, where the Portsmouth Granite Fire Brick Company owns and operates a fire brick manufactory or plant. Fire Brick is situated a half mile from the main line of appellant's railway and connected therewith by a spur or switch track. Three switches of this spur, known as the "coal track," "tipple track" and "loading track," enter the plant of the Portsmouth Granite Fire Brick Company. A local freight train which the appellant ran daily from Maysville to Russell in this State, upon reaching Fire Brick station on its main line, would take such cars as it had destined for the fire brick plant on the spur track out to the plant, and in returning to Fire Brick station would remove from the plant cars loaded with brick, consigned by the fire brick company to its customers. The moving and placing of cars on the various switches at the fire brick plant was also done by the engine of the local freight on these daily trips thereto. It appears that the appellee, Hudson, following his graduation from the Portsmouth, Ohio, high school at eighteen years of age, entered the employment of the Portsmouth Granite Fire Brick Company in June, 1910, and continued therein down to the date of the accident, November 11, 1910; and that among other things required of him it was his duty, as an employe of the brick company, to superintend and direct the moving and placing by appellant's engine of all cars on the various tracks or switches of that company. Appellant's local freight train was due at Fire Brick about one or two o'clock p. m. each day, but on the day of the accident it was late and did not get there until 4:30 or five o'clock p. m., about three hours behind its customary time. Upon its arrival appellee handed to John Glenn, the conductor, a list showing the cars that were to be moved about the plant and taken therefrom. At that time the engine had

in front of it a car of merchandise for the fire brick company and an empty box car, the engine being headed toward the plant. As it proceeded to the point where the car of merchandise was to be left there were two switches to be thrown, one switch leading to the left side of the dry-house of the plant, called the coal track, the other to the right side of the dry-house, called the loading track, and the second switch dividing the loading track into what is known as the tipple track and the loading track. The engine stopped just before it got to the dividing point of the loading track. Standing on the tipple track and so near the switch point that the engine and cars would not clear it on going in on the loading track, was a large steel gondola car loaded with brick, and as, because of its situation, this car would not permit the engine and other cars to clear it in going upon the loading track, it was necessary for them to first push the brick car on up the tipple track out of the way. The tracks were all up grade going into the plant.

The engine with the two cars in front of it came against the car loaded with brick and tried to push it up the tipple track, but failed to do so, because of the brakes being so tightly set upon it. At that time Hudson was standing on the upper side of the tipple track on the loading wall next to the dry-house. When the engine and cars pushed against the car loaded with brick the wheels of the engine began to revolve rapidly. Observing this, appellee jumped down off the loading wall and crossed at the back of the car loaded with brick to the opposite side of the tipple track, where he encountered Glenn, the conductor, who was standing near the north end of the brick car. Upon thus meeting the conductor appellee told him the brakes were set on the brick car. Thereupon, according to his testimony, the conductor told him to get up and let off the brakes, pursuant to which order he climbed up the ladder of the car and onto the brake platform, all the while in view of the conductor. Upon trying to release the brake by hand he found that he could not do so. He then kicked the "dog" of the brake without succeeding in releasing it. He next reached into the car, picked up a fire brick and with it pounded the dog of the brake loose, and when the brake was released the car lurched forward, which caused appellee to be thrown off to the track in front of it, resulting in the injuries already mentioned. The sudden lurch of the car, which moved

it forward six or eight feet, was admittedly caused by the pushing against it of the two cars and engine in the rear, at the time of the release of the brake.

It further appears from appellee's testimony, and is uncontradicted by any other witness, that as he climbed on the car and attempted to release the brake he could not see the engine or know whether it was then pushing against the car. Also that the conductor was then standing on the engineer's side of the train, in plain view of both appellee and the engineer, and was engaged in giving signals to the engineer with reference to the movements of the engine. It is the contention of appellee that his injuries were caused by the fact that the engine of the train was, by direction of the conductor, being pushed against the brick car while he was releasing the brake; that the conductor, knowing the danger in which such pushing of the brick car by the engine placed appellee while releasing the brake, was guilty of negligence in failing to signal the engineer to stop the pushing against the car by the engine, which signalling he might have done by a simple movement of the hand and thereby caused the stopping of the pushing in a second's time.

The record shows no contrariety of evidence as to the fact that the shoving of an engine under a full head of steam against a car locked by its brake will inevitably have the effect to suddenly move and jerk it forward when the brake is released. This is fully explained in the testimony of A. J. Hannon, an experienced railroad man, as follows:

"Q. 22. Now, if a car is sitting upon a track, one of those battleship gondola cars loaded with paving and the brakes are set on it and the engine comes in for the purpose of moving that car, I will get you to say whether or not it is usual or customary to attempt to move that car while the brakes are set? A. No, sir. Q. 23. I will get you to say whether or not, then, it was customary for the brakeman to undertake to release the brakes while the engine is pushing against a car? A. No, sir. Q. 24. What is the effect upon a car if the brakes are set upon a car for the engine to push against it? A. Well, it has a tendency to tighten the brake more on acount of the brake hangers and beam and brake shoes being connected to the body of the car—when an engine is shoving against a car and the brake is set, just the minute that brake is released the car will lunge forward—plunge forward

quickly. Q. 25. What effect will it have on the brake wheel? A. The effect would be, you would have revolving. of the brake wheel. Q. 26. Very quickly—you mean it would revolve very quickly? A. Yes, sir. Q. 27. I will get you to say whether or not that is a condition ordinarily and generally known among railroad men who operate railroad trains? A. Yes, sir. Q. 28. Now, how is the engine stopped if it is pushing against a car? A. By shutting off the throttle. Q. 29. How is that done; by the engineer? A. Just shoving in a throttle, works by a racket; it releases it and shoves it in. Can be done in a second, and the engineer is always sitting or standing with his hand on the throttle, unless he is doing something, and that is the only thing to be done when they are switching cars.''

Other experienced railroad men in appellant's employ, such as Holmes, Griffin and the conductor Glenn, testified to the same effect. So it cannot be doubted that one who releases a brake of a car when it is being pushed by the engine is placed in a situation of extreme danger, and the more inexperienced the person the greater is the peril. At least six other facts are clearly established by the evidence: (1) That the brake on the brick car had been so tightly set the day before by two of appellant's servants with a lever that it could not be released without knocking the dog, as was done by appellee. (2) That appellee had never before attempted to release a car brake. (3) That he was near and in view of appellant's conductor, Glenn, from the time he went upon the car until he was knocked from it by its sudden movement following the release of the brake. (4) That his inexperience at such work as he was attempting to do was also known to Glenn as was the imminent danger in which he was placed from the pushing of the car by the engine while he was releasing the brake. (5) That Glenn, as conductor, was superintending the moving of the brick car and in control of the engine and engineer, and could see and was seen by the latter, all the time appellee was trying to release the brake of the brick car. (6) That notwithstanding his knowledge of appellee's peril he at no time gave the engineer a signal to stop the pushing of the brick car with his engine, as he might have done with a signal of the hand.

There is a contrariety of evidence as to whether the conductor, Glenn, ordered appellee to go upon the car and

release the brake. Appellee testified that Glenn gave him such order and that in obedience thereto he went upon the car and performed the work of releasing the brake. Glenn testified that he ordered the release of the brake but did not give the order to appellee, and that it was intended for his brakeman, without indicating the name of the brakeman. While there were three brakemen belonging to the local freight train then on the ground, one of them Holmes, was some yards distant in control of the switch, Lambert, another, had gone back to the engine to prepare and light lanterns for use upon the train as night was approaching. The third brakeman, Griffin, was back behind the brick car making the coupling of the engine and other cars to it, or had just completed the coupling. He was then out of Glenn's sight, and while he heard the latter give the order to release the brake of the brick car he did not see or know to whom it was addressed, but evidently did not think it had been given to him as he made no attempt to obey it and probably could not have immediately done so.

The question submitted to the jury by the instructions of the court was, whether or not the conductor in charge of the train discovered appellee's peril in time to have prevented his injuries by the exercise of ordinary care. It is conceded by appellant's counsel that the instructions of the court were faultless if the case should have gone to the jury upon the theory indicated, but insisted by them that there was no evidence upon which to base the instructions, and that the only instruction authorized was one peremptorily directing a verdict for the appellant which it asked and the court refused at the conclusion of the evidence. In other words, it is appellant's contention that in undertaking to release the brake under the circumstances attending the act, appellee was guilty of contributory negligence, but for which his injuries would not have been received. There would be great force in this contention if the evidence had shown that appellee knew when he attempted to release the brake of the brick car that it was being pushed by the engine, and had realized the danger in which he placed himself in attempting to release the brake in the manner adopted by him; but we do not think the evidence shows contributory negligence.

Upon the other hand, though it be conceded that in releasing the brake upon the brick car, as was done by

him, appellee was a mere volunteer, as was held by the trial court, and that there was no emergency existing which authorized the conductor to employ or command outside assistance such as was rendered by appellee, as there was evidence conducing to prove that appellee's peril was discovered and known to the conductor in time to have prevented his injuries by the exercise of ordinary care, there can be no question as to the propriety of the action of the trial court in submitting the case to the jury upon this ground. In this view of the case it is immaterial whether appellee went upon the car with or without an order from the conductor, or that the latter was without authority to employ or command him to perform the duty required of him. It was, however, the duty of the conductor, upon seeing the danger to which appellee was subjected, as the evidence shows he did, to have stopped the engine from pushing; and this, according to the weight of the evidence, he might have done, by the exercise of ordinary care, in time to have prevented his injuries. So, if as claimed by counsel for appellant, appellee in undertaking the duty performed by him sustained no other relationship to appellant than that of a volunteer, or even a mere trespasser, the conductor nevertheless, upon discovering his peril, owed to him the duty of exercising ordinary care to prevent his injuries; and if his failure to exercise such care caused the injuries sustained by appellee, as much of the evidence conduced to prove, there could have been no error on the part of the trial court in submitting the case to the jury. The doctrine referred to is recognized in the cases of Clark v. L. & N. R. Co., 111 S. W. 344; C., N. O. & T. P. Ry. Co. v. Finnell's Admr., 108 Ky. 135; Hatfield v. Adams, 123 Ky. 428; L. & N. R. Co. v. Pendleton's Admr., 126 Ky. 605; Sou. Ry. Co. v. Pope's Admr., 133 Ky. 835; Derrickson's Admr. v. Swan-Day Lbr. Co., 115 S. W. 191; cited and relied on by counsel for appellant.

In Clark v. L. & N. R. Co., *supra,* upon which appellant's counsel most strongly rely, it was held that Clark was not entitled to recover because he was a mere volunteer in assuming the service, in performing which he was injured, and there was no negligence shown on the part of the conductor or train crew. It is, nevertheless, said in the opinion:

"Considering the matter from this standpoint and treating Clark as a volunteer, the only duty that the

company owed under the facts in this case was to exercise ordinary care to prevent injury to him. With the knowledge of the engineer and by the direction of the conductor, Clark was engaged in an effort to couple the engine to the cars, and, while in the performance of this act, the engineer was obliged to exercise ordinary care to prevent injuring him. So that the point upon which this case must turn is whether or not the engineer exercised this degree of care. If he did, the company was not liable, and the ruling of the trial court was proper. On the other hand, if he did not, the case should have gone to the jury.''

In the instant case the conductor was present and controlling the operation of the train, all the time in a position from which he could see and understand what appellee was doing and at the same time realize his danger, and even if appellee rendered the service performed by him without any order or direction from the conductor, the latter saw him go upon the car and release the brake, yet made no attempt to prevent him from doing either of these acts. The conductor at the same time was where he could see the engineer and be seen by him; but notwithstanding the danger to which he saw the appellee, an inexperienced boy of eighteen years of age, subject himself, and the knowledge he must have had that appellee could not, from the car, see that the engine was pushing it, he took no step to signal the engineer to stop the pushing of the engine against the car, although he might have done so by waiving his hand to the engineer to stop. Upon this state of facts it was peculiarly the province of the jury to determine whether the injuries sustained by appellee were caused by the failure of the conductor to exercise ordinary care to prevent them after discovering his peril. Hendrickson v. L. & N. R. Co., 137 Ky. 562; Davis' Admr. v. Ohio Valley Banking & Trust Co., 127 Ky. 800; Newport News, etc., R. Co. v. Carroll, 17 R. 374; I. C. R. Co. v. Timmons, 30 R. 1155; L. & N. R. Co. v. Willis, 83 Ky. 57.

Judgment affirmed.