BIDWELL COAL COMPANY, Appellant, v. FLORA DAVIDSON,
Appellee.

MASTER AND SERVANT:   Workmen's Compensation Act—Shot
1  Firer as Employee.   A shot firer, employed and discharged by
   the miners in a coal mine with the consent of the operating
   master, and paid from a fund created by the operator's deduct-
   ing a certain sum from the wages of each miner, is the em-
   ployee of the operator.

MASTER AND SERVANT:   Workmen's Compensation Act.   Wheth-
2  er certain facts constitute a workman the employee of the
   master is a question of law, and the decision of the Industrial
   Commissioner is reviewable by the court.

*Appeal from Wapello District Court.*—C. W. VERMILION
Judge.

NOVEMBER 15, 1919.

ACTION to recover compensation under the Workmen's
Compensation Act. The commissioner refused to allow
compensation, on the theory that the deceased was not the
employee of the company at the time he received his in-
juries. On appeal to the district court, a different conclu-
sion was reached. Appeal was taken to this court from the
action of the district court, and this is—*Affirmed.*

*Stipp, Perry, Bannister & Starzinger,* for appellant.

*John T. Clarkson, Fred C. Huebner,* and *John W.
Lewis,* for appellee.

GAYNOR, J.—This case arises under the Workmen's
Compensation Act. The defendant is the widow of one Ben
Davidson. She claims that her husband was killed while
in the employ of the plaintiff company.

1. MASTER AND SERVANT: Workmen's Compensation Act: shot firer as employee.

She claims, and the fact appears to be, that
the plaintiff company is a corporation or-
ganized under the laws of this state, and en-
gaged in the business of mining, selling, and
shipping coal, and was so engaged on and prior to the date
on which Ben Davidson sustained the injuries that caused
his death. Plaintiff company has a large number of men
employed in its mine, whose regular work is the mining of
coal. The mining is not done by picks. Holes are drilled
in the solid face. These holes are charged with powder and
tamped, leaving a fuse extending from the mouth of the hole
back to the charge. These fuses are lighted, and followed by
a blast which loosens the coal, preparatory to being loaded
in the mine car. After the blast, the coal is gathered and
loaded into cars by the miners. We need not enter into any
detailed statement of this work. The drilling of the holes,
charging the same with powder, tamping and placing the
fuse, and loading the coal are all necessary to the work of

securing the coal for the market, for which the company agrees to pay a stipulated sum per ton. After the holes are prepared by the miner in charge of the work, they are examined by what is called a shot examiner, for the purpose of ascertaining whether they are of the proper depth, and properly located so that they can be discharged with safety, not only to the operator's property, but to the miners as well. The statute requires the company to furnish the examiner, and he must be qualified for that purpose. The shot may be fired by the miner in charge of the work, or by a shot firer selected for the purpose. After the holes have been prepared, and examined by the examiner, the miner or the shot firer lights the fuse, to the end that the coal may be blasted from the face of the mine.

It is conceded that the examiner is employed and paid by the company. He is under the control and direction of the company. The contention here is that the shot firer is not an employee of the company, but is selected and controlled and paid by the miners themselves, and that it is his duty, as firer, to do that part of the work which the miner himself might do, and which it was his duty to do, in the absence of a shot firer. It appears that, prior to the time Ben Davidson was killed, one Medford had been employed by this company as shot examiner, and had been designated by the miners as the proper person to act in the capacity of shot firer, and acted in both capacities, up to a certain date, when he left. Thereupon, with the knowledge and consent of both parties (the miners and the company), Ben Davidson took his place, and acted in the capacity of shot examiner and shot firer. We do not find in the record any evidence of any specific employment of Davidson as shot firer. He acted as shot examiner with the knowledge and consent of the company. It was the duty of the company to furnish a shot examiner. The company accepted him to perform that work and discharge that duty. As

said before, though there was no specific evidence that Davidson was employed by anyone as shot firer, he discharged that duty with the full knowledge of the company, and was discharging that duty at the time he was killed, and, we take it, was killed while discharging the duty of shot firer. The work of shot examiner precedes that of the shot firer, and takes some time. After the work of examining is completed by the shot examiner, the shot firer follows, lighting each fuse as the same is prepared for that purpose. Where the same person acts as shot examiner and shot firer, he first proceeds with the examination, and, when that is completed, and after the miners have all left, lights the fuses to blast the coal from the solid. Davidson had only been working about two days when he was injured. He had been a miner before that time, and had worked in this same mine. He was discharging this double duty, and had completed his work as examiner before he began the firing. He had already fired some of the shots in the mine when the explosion occurred which caused his death.

The following stipulation was entered into between the parties, at the time of the submission of the cause to the Industrial Commissioner:

"1. Benjamin Davidson sustained an injury which caused his death in the defendant coal company's mine, which occurred on or about September 6, 1916.

"2. That the defendant company owned and operated the mine in or near the village of Bidwell, Wapello County, Iowa, being the mine in which Benjamin Davidson sustained the injury which caused his death.

"3. That the defendant company was operating under the Workmen's Compensation Law, on and prior to September 6, 1916.

"4. That Benjamin Davidson came to his death on said date in said mine in the course of and growing out of his employment of shooting down coal.

"5. That Flora Davidson is the surviving widow of Benjamin Davidson, and is the dependent of decedent, Benjamin Davidson.

"6. That Exhibit A is the agreement between the Miners and Coal Operators of Iowa, being an agreement between the members of the Coal Operators Association on one part, and the members of District 13, U. M. W. of A., on the other part.

"7. That Benjamin Davidson was a member of Local Union No. 3039, in good standing, at Bidwell, Iowa, which Local Union was a constituent part of District 13, U. M. W. of A., under which agreement the said Benjamin Davidson, as a member of said Local Union, was working on September 6, 1916.

"8. That on said date, to wit, September 6, 1916, the Bidwell Coal Company was a member of the Iowa Coal Operators Association, and working under said agreement."

Under this stipulation, but one question remains open for consideration: Was Ben Davidson an employee of the plaintiff company at the time he received his injuries?

At the time he received his injuries, he was acting in the capacity of shot firer. The Exhibit A referred to in the stipulation is what is known as "The Des Moines Agreement," an agreement between the coal operators and coal miners, which contains, among other things, the following:

"Whenever a majority of miners in any mine so decide, they may employ a shot firer for said mine, and whenever satisfactory arrangements can be made between the miners and the shot examiner for the same person to act as shot examiner and shot firer, the same may be done."

As said before, the state law requires the coal company to employ a shot examiner, but it does not require them to employ a shot firer: at least, this duty is not imposed by the statute. It grew to be a custom in mines to select as shot firer the one appointed by the company as shot ex-

aminer. A shot examiner was required to have a certificate of qualification, and, we take it, it was thought to be safer for all that a qualified man should act in the dual capacity. But this was not imperative. The miners had a right, under this agreement, to designate and select any other person as shot firer, if they so wished.

While it does not appear affirmatively in this case that the miners selected Davidson, yet he was acting as shot firer with the knowledge and consent of the miners and the operators. He had succeeded to the work of Medford both as shot firer and shot examiner, and was discharging this double duty. It appears that the miners have not only the right to select the shot firer, but have the right, also, to discharge him. On complaint to the state inspector, however, the company may secure his removal, if he is shown not to be qualified or competent for the work. Davidson was paid by the company as shot examiner. He was paid as shot firer in the following way: It was assumed, and probably is true, that the duty of firing the shot rested on the miner, and was included in the work necessary to be done in mining the coal, for which the operator allowed so much per ton. Both parties assuming, however, that it would be better to have one person do the firing than to have each miner discharge his own shot, they entered into an agreement by which the company deducted from the amount allowed per ton a certain sum, to be and which was paid to the Local Union, to compensate the shot firer for his work. This was paid by it to the shot firer. That is, the company did not pay to the miner the full sum per ton which the agreement called for, because of the fact that the miner did not discharge his own shots, and another was employed, by mutual consent, to do that work which the miner ordinarily was called upon to do, in order to earn the sum allowed for mining a ton. The company, therefore, deducted from the sum per ton allowed for the completed

work a sufficient amount to meet the demands of the shot firer.

What is the situation, then? This company was engaged in mining coal for the market. Its business was to get this coal out of the ground and upon the market. To this end, it employed men to bring the coal from the ground, that the company might place it upon the market. Every act in the mine in the way of getting this coal to the surface of the ground was done in the service of the company, and to effectuate the purpose for which the company was organized, and to make profitable to the company the work it had undertaken. The boring of these holes in the face of the mine, preparing the blast, and tamping the hole, was all work done in furtherance of that purpose. The examining and the firing were all done with one end in view, to wit, to secure coal for the market. Had the miner who bored the hole charged it with powder and tamped it, and lighted the fuse to the blast, he would clearly be in the line of his employment, and clearly working as an employee in the service of the company. If he was injured or killed while so engaged, compensation should be made under the Workmen's Compensation Act. However, the company delegated to the miners the right to select one man to discharge this specific duty. This duty, when discharged, was discharged in the interests of the company. The agreement between the company and the miners was that the miners might designate or select a person to do this firing, instead of doing it themselves. The company was not willing, however, to pay the miner the full amount per ton which he was entitled to under his contract, unless he did the firing which was a part of that work. It was not willing to pay the miner the full price for mining a ton, while another was employed and paid for doing a part of the work. So it was agreed that the company should deduct a sum per ton from what it had agreed to pay per ton for the

completed work, and pay this to the one who did this part of the work. The miners and the company agreed that this sum should be paid by the company to the man who did this particular work for the company.

So we find that the shot firer was, in fact, paid by the company. In the bookkeeping of the company, it would appear that the full sum per ton agreed to be paid was allowed to the miner for mining the coal, and that the miner, out of this sum, paid the shot firer. That, however, is a mere matter of bookkeeping. The real purpose and intent of the agreement was that the miner should not receive the full price per ton for mining, while another was doing part of the work essential to be done in order to procure the ton for which the compensation was allowable; that the company should pay to the one who did part of the work a portion of the sum which it had agreed to pay per ton for mining the coal.

It is next contended that the deceased was not an employee of the defendant, for the reason that he was not under the control of the company; that he was employed by and the power to discharge him rested in the miners themselves, and not in the company.

It is true, as a general proposition, and we think the record shows it was so understood in conferences between the miners and the company, that the management of the mine and the direction of the mine are vested exclusively in the operators of the mine, and that the miners have no right to abridge this right. The selection of a shot firer was given by the company to the miners in the mine, and it is said that, whenever a majority of the miners in any mine decide to do so, they may select the shot firers for the mine. That is, the company, having authority to select its own employees, delegated to the miners the right to select certain persons to do certain work in the mine. The work to be done in the mine was for the use and benefit of the

mine owners.  The power to select the workmen rests orig-inally and primarily in the owners.  They may delegate that right to select to another.  The selection made under this delegated power is the selection of the mine operators them-selves.  Ordinarily, the mine owners have a right to control the action of their employees, and discharge them, if thought proper.  The law gives them this right.  They may delegate to the miners themselves a right to select the shot firer.  The miners are peculiarly interested in this selec-tion.  They are in a position to judge of the character of the man employed.  Their work and their personal safe-ty are involved in the selection.  They designate a person. The person designated is satisfactory to the operators of the mine, and they consent that the person selected perform this work in the mine.  The work is performed for the com-pany, in the interests of the company, and for the advance ment of the very purpose for which the company is organ-ized.  The company may delegate the right to supervise the person selected, and the right to discharge him whenever his conduct imperils the safety of the miners.  In this, too, the miners act under delegated power from the owner.  When the company delegates this power to the miners, and they act,—make the selection,—the act of selecting becomes the act of the mine owners themselves.  We think that, here, the most that can be said of the arrangement between the miners and the operators was that the operators had dele-gated this right to the miners.

This thing is clear: This man was working in the mine, doing work for the company in the mine, with the knowl-edge and consent of the company, and for the purpose of more effectually carrying on the work in which the opera-tors were engaged.  He was engaged, at the time he was injured, in performing an indispensable part of the mining operations carried on in the mine.  He was doing a part of the business of mining for which miners were directly em-

ployed. The appellant knew that he was doing this work for them. If he had been employed directly by the company as shot firer, the liability of the company would be apparent, under the Workmen's Compensation Act. The fact that they had delegated to the miners the right to select him to do this particular work, indispensable to a proper carrying on of the work, does not change the relationship.

The statute is to be liberally construed, so as to get it within the spirit, rather than within the letter of the law. See *Brienen v. Wisconsin Pub. Serv. Co.*, 166 Wis. 24 (163 N. W. 182). In construing the provisions of the Compensation Law, the court is bound, not to a narrow, technical construction, but rather to a broad and liberal construction, to make effectual the very purposes for which the law was passed. *Rish v. Iowa Portland Cement Co.*, 186 Iowa 443; *State v. District Ct. of St. Louis County*, 128 Minn. 43 (150 N. W. 211).

We think Section 2477-m16, Code Supplement, 1913, is peculiarly applicable to the facts of this case. As bearing upon this question, see *Aga v. Harbach*, 127 Iowa 144; *Hitchcock v. Arctic Creamery Co.*, 170 Iowa 352, 368.

We reach the conclusion, therefore, that Ben Davidson was an employee of the plaintiff company at the time he received his injuries; that this fact brought the case within the purview of the Workmen's Compensation Act; and that the commissioner erred in finding to the contrary.

It is argued in this case that we are bound by the fact finding of the board of arbitration, and the finding of the commissioner on review.

It is true that, as to disputed facts which do not go to the jurisdiction, we are bound by the finding of the commissioner; but where the only question presented is wheth-

er or not the jurisdictional fact exists, en-
2. MASTER AND    titling the person to be heard before the
SERVANT:
Workmen's     commissioner, we have a right to review the
Compensation
Act.              action of the commissioner, even to the ex-
tent of finding the fact to be other than the
commissioner found it. Upon this point, see *Griffith v. Cole
Bros.,* 183 Iowa 415, and cases therein cited.

The district court from which appeal was taken found, as a matter of fact, that the deceased was an employee of the plaintiff at the time he received his injuries. It is stipulated in the agreement, hereinbefore set out, that the injury grew out of and was received in the course of his employment. We agree with the district court in its finding. Its action is, therefore,—*Affirmed.*

LADD, C. J., WEAVER and STEVENS, JJ., concur.