## IN RE DUNCAN.

[No. 10,810.    Filed May 11, 1920.]

1. MASTER AND SERVANT.—*Workmen's Compensation Act.—Liberal Construction.—Cases Within Reason Though Outside Letter.*—The Workmen's Compensation Act should be liberally construed to promote the purpose of its enactment, even to the inclusion of cases within the reason, though outside the letter, of the statute.  p. 273.

2. MASTER AND SERVANT.—*Workmen's Compensation Act.—Underlying Principle.*—The underlying principle of the Workmen's Compensation Act is that the economic loss resulting each time a workman is killed or injured ought to be borne by the industry involved and the consumers of its products, rather than by the workman, his dependents or society at large. p. 274.

3. MASTER AND SERVANT.—*Workmen's Compensation.—Mining.—Shot Firers.—Employés.*—A shot firer selected by the miners and paid through a union official under an arrangement with the operator of the mine for an agreed deduction by the operator out of the agreed ton price for all labor needed in mining coal, and doing blasting and firing in the mine with the knowledge and consent of the operator, was an employe of such operator within the meaning of the Workmen's Compensation Act.  p. 275.

From the Industrial Board of Indiana.

Proceeding by Frank Duncan against the Grant Coal and Mining Company under the Workmen's Compensation Act.

Certified questions of law submitted by the Industrial Board.  *Questions answered.*

McMAHAN, J.—The Industrial Board has certified the following statement of facts to this court:

The Grant Coal and Mining Company, on July 11, 1919, and for many years prior thereto, was engaged in the business of mining, selling and shipping coal from a mine in Vigo county, Indiana, known as the Grant Mine, and employed in its said business approximately

400 men.   The coal in said mine cannot be mined easily or profitably with a pick without first being blasted. For the purpose of blasting the coal, holes are drilled into the face thereof.   These holes are then charged with powder and tamped, with fuses extending from the charge back to the mouth of the hole.   These fuses being ignited burn up to the charge, when an explosion takes place and loosens the coal, so that it may be shoveled into cars.   This work constitutes a necessary part of the mining of the coal.   In practical mining the fuses may be lighted either by the miner loading the coal or by a shot firer selected for that purpose.   In a mine like the Grant Mine, where many miners are employed, it is safer both for the property of the mine owner and the persons of the miners to have the fuses lighted or the shots fired by a regular shot firer after the miners have left the mine.

On July 11, 1919, and at all other times mentioned herein, the Grant Mine was a union mine, that is, all the miners employed therein were members of "Local Union 953," which was a constituent part of the United Mine Workers of America, District No. 11, and during all of said time the Grant Coal and Mining Company was a member of the Indiana Bituminous Coal Operators Association.   On May 19, 1916, the Indiana Bituminous Coal Operators Association and District No. 11, United Mine Workers of America, entered into a wage agreement effective April 1, 1916, to March 31, 1918, and which was continued in force by the mutual agreement of said association and the United Mine Workers for a period of two years from April 1, 1918. The Grant Coal and Mining Company and the miners employed therein were, on July 11, 1919, operating under said agreement.   In said agreement a specific price per ton was fixed for mining coal, and it was stipulated in said agreement that "the price per ton for min-

ing herein agreed to for pick and machine work shall include all labor necessary to cut the coal, drill, blast the same, load it on the miner's car and properly care for and timber the miner's working place, and that no division of the scale shall carry any exception to this rule." An agreement or understanding was entered into between the Grant Coal and Mining Company, and the miners employed therein, whereby said miners were to select a person as shot firer to do the shooting or blasting for them. Pursuant to said agreement or understanding, said shot firer was to be selected by the miners employed therein, and was to be absolutely under their control and subject to their discharge and order. Pursuant to said arrangement, said Local Union No. 953, including the miners working in said Grant Mine, selected Frank Duncan as the shot firer to fire the shots in said mine. On July 11, 1919, and for a long time prior thereto, said Duncan had been doing the shooting, firing and blasting in said mine with the knowledge and consent of the Grant Coal and Mining Company. Under an arrangement between the miners employed in said mine and said Grant Coal and Mining Company, Frank Duncan was paid for his services as shot firer in said mine by and through a device by which the company separated the agreed per ton price for mining the coal, paying part of it directly to the miners, and an amount equal to the compensation of said Frank Duncan to the financial secretary of Local Union 953, to be paid by him to said Frank Duncan for his services as shot firer. The amount paid to the miners directly by the Grant Coal and Mining Company and the amount paid to said financial secretary equaled the per ton price for mining coal as agreed upon in the wage contract of May 19, 1916, and it required both of said amounts to equal the per ton price as specified in said contract. In other words, the Grant Coal and Mining Company

did not pay to individual miners the full sum per ton fixed in said wage agreement, but paid to them a certain portion thereof, and to the financial secretary of Local Union 953 the remainder thereof to be by him paid to said Frank Duncan for his services as shot firer. The average weekly wages of said Duncan as shot firer was $24. On July 11, 1919, while engaged in firing shots in said mine, Frank Duncan received a personal injury by reason of an explosion arising out of and in the course of his said work, which resulted in such disability as will entitle him to an award of compensation against the Grant Coal and Mining Company at the rate of $13.20 per week if he in fact was at the time of such injury an employe of said company. He has filed a claim for compensation under the Workmen's Compensation Act. Acts 1915 p. 392, §80201 *et seq.* Burns' Supp. 1918. This claim is resisted by the Grant Coal and Mining Company upon the sole and only ground that at the time of receiving his injury he was not in its employ.

Upon the foregoing facts the Industrial Board by virtue of §61 of the Workmen's Compensation Act (§8020s2 Burns' Supp. 1918, Acts 1917 p. 154) has submitted the following questions of law for our determination.

(1) Would a finding that Frank Duncan was an employe of the Grant Coal and Mining Company at the time of his injury be sustained by sufficient evidence? (2) Would such a finding be according to law?

The Workmen's Compensation Act, *supra,* sought the correction of recognized errors and abuses by introducing new regulations for the advancement of the

1. public welfare. Being remedial in character, it should be construed with regard to former laws and the defects or evils to be corrected and the remedy

provided.  It should be liberally construed to the end that the purpose of the legislature, by suppressing the mischiefs and advancing the remedy, be promoted, even to the inclusion of cases within the reason, although outside the letter, of the statute.  36 Cyc 1175.

Prior to the enactment of the Workmen's Compensation Act, *supra,* the consequential and financial losses to workmen engaged in industrial activities were borne by the workmen themselves, by their dependents, or by the state at large.  The legislature by the passage of this act indicated its belief that this loss should be borne by the industries causing them, or more accurately by the consumers of the products of the industry causing the loss.

The Supreme Court of Ohio, in speaking upon this subject, said:  "The theory upon which the compensation law is passed (which is now generally accepted) is that each time an employe is killed or injured there is an economic loss which must be made up or compensated in some way, that most accidents are attributable to the inherent risk of employment—that is, no one is directly at fault—that the burden of this economic loss should be borne by the industry rather than by society as a whole, that a fund should be provided by the industry from which a fixed sum should be set apart as every accident occurs to compensate the person injured, or his dependents, for his or their loss."  *State, ex rel.* v. *Industrial Comm.* (1915), 92 Ohio 434, 111 N. E. 299, L. R. A. 1916D 944, Ann. Cas. 1917D 1162.  See, also, *McRoberts* v. *Nat. Zinc Co.* (1914), 93 Kan. 364, 144 Pac. 247; *Milwaukee* v. *Miller* (1913), 154 Wis. 652, 144 N. W. 188, L. R. A. 1916A 1, Ann. Cas. 1915B 847; *Lewis, etc., County* v. *Industrial Acc. Board* (1916), 52 Mont. 6, 155 Pac. 268, L. R. A. 1916D 628; *Peet* v. *Mills* (1913), 76 Wash. 437, 136 Pac. 685, L. R. A. 1916A 358, Ann. Cas. 1915D 154.

The facts as certified by the board are almost identical with the facts in the case of *Bidwell Coal Co.* v. *Davidson* (1919), 187 Iowa 809, 174 N. W. 592. There,

3. as here, the agreement was to pay a fixed price per ton for the coal mined. The miners had the right to select and discharge the shot firer. The mining company deducted from the per ton price a sum sufficient to pay the shot firer. It was there held that the shot firer was an employe of the mining company. The reasoning of the court in that case is so applicable to the facts now under consideration that we can do no better than to adopt the same. In discussing the question, the court said:

"This company was engaged in mining coal for the market. Its business was to get this coal out of the ground and upon the market. To this end, it employed men to bring the coal from the ground, that the company might place it upon the market. Every act in the mine in the way of getting this coal to the surface of the ground was done in the service of the company, and to effectuate the purpose for which the company was organized, and to make profitable to the company the work it had undertaken. The boring of these holes in the face of the mine, preparing the blast, and tamping the hole, was all work done in furtherance of that purpose. The examining and the firing were all done with one end in view, to wit, to secure coal for the market. Had the miner who bored the hole charged it with powder and tamped it, and lighted the fuse to the blast, he would be clearly in the line of his employment, and clearly working as an employe in the service of the company. If he was injured or killed while so engaged, compensation should be made under the Workmen's Compensation Act. However, the company delegated to the miners the right to select one man to discharge this specific duty. This duty, when discharged, was dis-

charged in the interests of the company. The agreement between the company and the miners was that the miners might designate or select a person to do this firing, instead of doing it themselves. The company was not willing, however, to pay the miner the full amount per ton which he was entitled to under his contract, unless he did the firing which was a part of that work. It was not willing to pay the miner the full price for mining a ton, while another was employed and paid for doing a part of the work. So it was agreed that the company should deduct a sum per ton from what it had agreed to pay per ton for the completed work, and pay this to the one who did this part of the work. The miners and the company agreed that this sum should be paid by the company to the man who did this particular work for the company.

"So we find that the shot firer was, in fact, paid by the company. In the bookkeeping of the company, it would appear that the full sum per ton agreed to be paid was allowed to the miner for mining the coal, and that the miner, out of this sum, paid the shot firer. That, however, is a mere matter of bookkeeping. The real purpose and intent of the agreement was that the miner should not receive the full price per ton for mining, while another was doing part of the work essential to be done in order to procure the ton for which the compensation was allowable; that the company should pay to the one who did part of the work a portion of the sum which it had agreed to pay per ton for mining the coal.

"It is next contended that the deceased was not an employe of the defendant, for the reason that he was not under the control of the company; that he was employed by and the power to discharge him rested in the miners themselves, and not in the company.

"It is true, as a general proposition, and we think the

record shows it was so understood in conferences between the miners and the company, that the management of the mine and the direction of the mine are vested exclusively in the operators of the mine, and that the miners have no right to abridge this right. The selection of a shot firer was given by the company to the miners in the mine, and it is said that, whenever a majority of the miners in any mine decide to do so, they may select the shot firers for the mine. That is, the company, having authority to select its own employes, delegated to the miners the right to select certain persons to do certain work in the mine. The work to be done in the mine was for the use and benefit of the mine owners. The power to select the workmen rests originally and primarily in the owners. They may delegate that right to select to another. The selection made under this delegated power is the selection of the mine operators themselves. Ordinarily, the mine owners have a right to control the action of their employes, and discharge them, if thought proper. The law gives them this right. They may delegate to the miners themselves a right to select the shot firer. The miners are peculiarly interested in this selection. They are in a position to judge of the character of the man employed. Their work and their personal safety are involved in the selection. They designate a person. The person designated is satisfactory to the operators of the mine, and they consent that the person selected perform this work in the mine. The work is performed for the company, in the interests of the company, and for the advancement of the very purpose for which the company is organized. The company may delegate the right to supervise the person selected, and the right to discharge him whenever his conduct imperils the safety of the miners. In this, too, the miners act under delegated power from the owner. When the company delegates

this power to the miners, and they act,—make the selection,—the act of selecting becomes the act of the mine owners themselves.   We think that, here, the most that can be said of the arrangement between the miners and the operators was that the operators had delegated this right to the miners.

"This thing is clear:   This man was working in the mine, doing work for the company in the mine, with the knowledge and consent of the company, and for the purpose of more effectually carrying on the work in which the operators were engaged.   He was engaged, at the time he was injured, in performing an indispensable part of the mining operations carried on in the mine. He was doing a part of the business of mining for which miners were directly employed.   The appellant knew that he was doing this work for them.   If he had been employed directly by the company as shot firer, the liability of the company would be apparent, under the Workmen's Compensation Act.   The fact that they had delegated to the miners the right to select him to do this particular work, indispensable to a proper carrying on of the work, does not change the relationship."

We are not without authority in this state for holding that a shot firer who is hired by the miners, as was Frank Duncan, is an employe of the mining company and authorized to maintain an action for damages on account of injuries sustained by him in the course of his employment. *Princeton Coal, etc., Co.* v. *Downer* (1911), 48 Ind. App. 136, 93 N. E. 1009.   See, also, *Princeton Coal, etc., Co.* v. *Lawrence* (1911), 176 Ind. 469, 95 N. E. 423, 96 N. E. 387, where the question is discussed, but not decided.   The court in this case, after referring to the allegations of the complaint relative to the duties of the shot firer and the method of paying him, at page 480 said:   "Fairly construed, this means that appellant consented to and approved the selections

made by the miners, but in any event these shot firers were not mere licensees, and it is not necessary that we should determine whether they were servants of appellant.  They were in the mine pursuant to the express provisions of a statute.  It was more than an invitation to be there.  They were there engaged in business for the operator, not in their own business, except as their business was that of assisting in mining coal, in carrying out a distinct part of the business of the operator, with its knowledge and consent, and we see no difference between the duty owing to them in regard to sprinkling the mine, than that owing to the miners proper.  The law was enacted for the benefit of all persons whose work requires them to be in the mines, in and about the business of the operator in coal mining, whether or not the strict relation of master and servant existed between appellant and appellee's decedent."  See, also, *Rummell* v. *Dilworth, etc., Co.* (1885), 111 Pa. 343, 2 Atl. 355; *Tennessee Coal, etc., Co.* v. *Hayes* (1892), 97 Ala. 201, 12 South. 98; *Haluptzok* v. *Great Northern R. Co.* (1893), 55 Minn. 446, 57 N. W. 144, 26 L. R. A. 739; *Pugmire* v. *Oregon, etc., R. Co.* (1907), 33 Utah 27, 92 Pac. 762; *Texas, etc., R. Co.* v. *Parsons* (1908), (Tex. Civ. App.) 109 S. W. 240.

In *Ringue* v. *Oregon Coal Co.* (1904), 44 Ore. 407, 75 Pac. 703, the appellant was assisting his father, who was working in appellee's mine mining coal at a fixed price per ton.  While engaged in that work appellant received an injury and sued for damages.  The trial court instructed the jury to the effect that appellant's right to recover depended upon his employment by the coal company, and that he was not entitled to recover unless there was an actual contract of employment, even though he may have been working in the mine at the request of his father with the mining company's permission and consent, and for its benefit.  The court in

discussing these instructions held that the burden of proof was upon the appellant to show such a state of facts as under the law of negligence would constitute the relation of master and servant and said: "We do not understand, however, that it was necessary for him to prove a direct contract by some authorized agent of the defendant employing him, or that his right to work was included in the terms of the contract with his father. If, as the evidence tended to show, he was going into the mine at the time of the accident by the request of his father, with the permission or consent of the defendant, express or implied, for the purpose of performing work or labor for it, he was not a trespasser or a licensee, but was rightfully in the mine, and the relation of master and servant existed between him and the defendant, within the meaning of the rule requiring a master to exercise reasonable care to prevent injury to his employes."

In *Tennessee, etc., R. Co.* v. *Hayes, supra,* the railroad company had employed Randall Hayes, father of appellee, to load coke into cars, paying him so much per car. The appellee was assisting his father in this work and, while so doing, he received an injury. Randall Hayes was under the control and direction of the company's superintendent or foreman, who had authorized the elder Hayes to bring appellee along with him and put him on the work. A man by the name of Ried and his son were also employed by the railroad company to load cars, and received so much for each car loaded. They were loading a car near where appellee was working, and through their negligence appellee received an injury. The court in holding the railroad company liable for damages said: "Not only is the defendant liable for injuries caused by the negligence of the Rieds in moving the car upon which they were engaged, but, in our opinion, that liability may be enforced by the plain-

tiff under section 2590 of the Code, known as the Employers' Liability Act, under one aspect of the evidence as to the relation existing between plaintiff and the defendant."

Most of these cases were decided prior to the adoption of a workmen's compensation law, or at least without reference to such a law, and without applying the liberal rule of construction, which courts apply for the purpose of carrying into effect the purposes sought to be reached by the enactment of compensation laws.

The decisions in negligence cases such as those above mentioned are not necessarily controlling in cases like the present; for the liability of the employer in cases under the Workmen's Compensation Act arises, not from any wrong done by the employer, but from the statute, which imposes such liability upon persons bearing toward each other the relation of employer and employe as defined in the statute.

Our attention has been called to §8610 Burns 1914, Acts 1907 p. 347, §9, which provides: "That at any coal mine in the state where the miners working therein so elect, persons may be employed to act as shot firers, and their wages shall be paid by the miners working therein. Provided, that nothing herein contained shall affect any existing contract as to shot firers."

We do not believe that this statute has any controlling influence in the determination of the questions submitted. It does not appear that it had anything to do with the agreement between the Grant Coal and Mining Company and the miners, or that its provisions were considered by them when the arrangement was made for the selection and employment of Mr. Duncan as shot firer. As said by the Supreme Court in *Princeton Coal, etc., Co.* v. *Lawrence, supra:* "It will be noted that it is not provided in the act that the miners shall have the right to select the shot firers, but if they elect to

have shot firers, those so electing are to pay their wages."

The company, by agreement, delegated a right to select, control and discharge the shot firer to the miners. And, as said in *Bidwell Coal Co.* v. *Davidson, supra:* "This duty, when discharged, was discharged in the interests of the company," and, as stated in the facts submitted, was a necessary part of its business.    The mining company was using the services of Frank Duncan for pay, and under §76 of the Workmen's Compensation Act, *supra,* was his employer, and he an employe of the mining company.    The method by which the shot firer was paid amounts to nothing more than a matter of bookkeeping, and does not change the relations existing between the mining company and Mr. Duncan.    *Bidwell Coal Co.* v. *Davidson, supra.*

In accordance with the authorities herein cited, which we believe to be expressive of the law and supported by reason, we answer each question submitted by the board in the affirmative.