### TILLING v. INDEMNITY INS. CO. OF NORTH AMERICA. (No. 8840.) *

(Court of Civil Appeals of Texas. Galveston. March 18, 1926. Rehearing Denied April 8, 1926.)

1. **Master and servant ⟜361—Night watchman furnished company by detective agency retaining entire control over him held not employee of company (Workmen's Compensation Act, pt. 4, § 1 [Vernon's Ann. Civ. St. Supp. 1918, art. 5246—82]).**

Night watchman furnished company by detective agency retaining entire control and direction over him and paying his wages *held* not an employee of company, within Workmen's Compensation Act, pt. 4, § 1 (Vernon's Ann. Civ. St. Supp. 1918, art. 5246—82).

2. **Master and servant ⟜367—Detective agency furnishing watchman for company but retaining control over and paying him held independent contractor.**

Detective agency, furnishing night watchman for a company but retaining control over and paying watchman, for which agency was compensated by the company, *held* to occupy relation of independent contractor with company.

3. **Master and servant ⟜361—Night watchman, furnished by agency for company dealing exclusively with agency respecting services, held employee of agency.**

Where company exercised no control over night watchman, but dealt exclusively for his services with independent agency furnishing watchmen, depending solely on agency for proper doing of work, watchman was an employee of agency furnishing his services to the company.

4. **Master and servant ⟜361—Furnishing of clock and slips to night watchman obtained from detective agency by company held not supervision by company over watchman's work.**

Where night watchman was furnished by detective agency to company dealing exclusively with agency, furnishing of clock and paper slips by company to night watchman for use in his work *held* not to amount to a supervision over watchman's work, so as to make him employee of company.

Appeal from District Court, Harris County; Roy F. Campbell, Judge.

Proceeding under the Employers' Liability Act by Addie M. Tilling for the death of William A. Tilling, her husband, opposed by Horton & Horton, Inc., employer, and the Indemnity Insurance Company of North America, insurer. From a judgment denying claimant compensation, she appeals. Affirmed.

Sam H. Lewis and Hunt & Teagle, all of Houston, for appellant.

Baker, Botts, Parker & Garwood, of Houston, for appellee.

GRAVES, J. This appeal by Mrs. Tilling is from a judgment of the court below denying her any compensation, under the Employers' Liability Act, for the death of her husband, William A. Tilling, who was killed by a passing automobile between 9 and 10 o'clock on the night of December 31, 1924, at a point on McKinney avenue in the city of Houston between the two parts of the plant of Horton & Horton, Inc., located upon the north and south sides of such street at that place; at the time he was so killed, Tilling had with him the watchman's clock referred to in this further written stipulation of the facts agreed to by the parties on the trial:

"Said Tilling on and prior to the 31st day of December, 1924, was watching the plant of Horton & Horton at night; the said plant was located on both sides of McKinney avenue in the city of Houston, Tex., and it was necessary for the watchman, in the performance of his duty, to cross McKinney avenue from one part of said plant to the other. Said watchman carried a clock that contained paper dials or discs, and there were keys fastened in various parts of said plant which fitted into the clock carried by the watchman and registered on said paper dials the hour or time at which the watchman visited each key. These keys and the clock were furnished by Horton & Horton. The said watchman was supplied to the said Horton & Horton by the James McCane Detective Agency of the city of Houston, Tex., and Horton & Horton paid direct to said McCane Detective Agency the sum of $100 per month for said watch service, and said McCane paid direct to Tilling the sum of $75 per month."

It was further shown that at the time of the accident Horton & Horton, Inc., was engaged in the sand and gravel business, while the McCane Agency was, as its name implies, engaged in the general detective business, including such watch services at night over different properties and establishments as that in which the deceased Tilling was engaged. Horton & Horton, Inc., was a subscriber to the Liability Act and carried insurance thereunder for the benefit of its employees, while the McCane Agency was not and did not.

The trial court disposed of the cause without a jury, entering a general judgment in favor of the appellee Indemnity Company, no findings of fact or conclusions of law being either requested or filed.

In her appeal to this court from the adverse judgment, Mrs. Tilling contends that the trial court erred in holding: (1) That her deceased husband was not an employee of Horton & Horton, Inc.; (2). that the relationship of employee and employer did not exist between them; and (3) that her husband was not killed in the course of his employment with that firm.

The controlling question the appeal presents is, we think, whether or not at the time of the accident Tilling was an employee of the firm of Horton & Horton, Inc., within the meaning of our compensation law, § 1, pt. 4, Vernon's Ann. Civ. St. Supp. 1918, art. 5246–82, providing:

" 'Employee' shall mean every person in the service of another under any contract of hire, expressed or implied, oral or written, except * * * one whose employment is not in the usual course of trade, business, profession or occupation of his employer."

" 'Employer' shall mean any person, firm * * * or corporation * * * that makes contract of hire."

Further details of the arrangement under which the deceased was watching the Horton plant are given in these excerpts from the testimony of the superintendent and the president of the firm, respectively:

The superintendent testified:

"On this occasion he was stationed at the plant of Horton & Horton on McKinney avenue, in the city of Houston; their plant was located on both sides of the street. At the time of Mr. Tilling's death, he was making about $79 per month—$75 per month—and we paid his street car fare to and from the office. We paid Mr. Tilling every two weeks, or whenever he wanted it, if he had it coming to him. Horton & Horton paid the McCane Detective Agency $100 per month. That is the arrangement we had with them. McCane's National Detective Agency paid $79 per month to Mr. Tilling, and Horton & Horton paid the McCane National Detective Agency $100 per month. * * * The clock that is carried by watchmen is used by all watchmen to register different keys. He did not watch any other plant at this time. * * * I could not tell you whether myself or whether one of the assistants in the office employed Mr. Tilling. Mr. Horton had nothing to do with employing him. Mr. Horton had no right to fire him. In checking up the paper dials on the clock, if there was anything about that record that Mr. Horton did not like, under our arrangement, he was to take it up with McCane's National Detective Agency. He was not to take it up with Mr. Tilling or any one else who was watching at the plant. Under our arrangement with Mr. Horton, he had nothing to do with any of our watchmen—Bill Smith, John Jones, or Mr. Tilling—who were sent there to watch. McCane sent whichever of his employees he desired on this job. If it suited our convenience, we could or would have been at liberty to send different watchmen to Horton & Horton every night. There was no specification as to who, or how many, different men we were to send out there to watch. Mr. Horton had nothing to do with how much salary we paid the

watchmen. He paid McCane $100 per month, and we furnished the watchmen. His arrangement with us was to furnish a watchman. The arrangement we had did not contemplate or provide that we would send any particular man. The matter of checking up those paper dials was a matter of convenience, whether he did it or we did it. The clock arrangement was so that you could tell if the watchman is, or has been, on the job. Mr. Tilling was a watchman for McCane's for several months prior to the time of his death. The first job he had, as I recall it, was the Art Museum. We moved him from place to place as suited our convenience. There was no difference between our arrangement with Mr. Tilling and our other employees in that respect. I have stated that Mr. Horton had no right to discharge Tilling. It is a fact that McCane's Agency and its superintendent had the control over this man, Tilling, directed his movements, told him where to go, and so forth. That is a fact. Mr. Horton did not have the right to control the details of his work and where he should go. McCane's furnishes watchmen to a great number of people in Houston. We changed the men around whenever it suited our convenience. Horton and these other people had nothing to say about that. We could have discharged Mr. Tilling whenever we desired at any time. We could have sent any other man on that job we desired. Mr. Tilling took orders from McCane's Agency. They furnished Mr. Tilling with a cap and a badge. That indicated he was our man and working for us. We have a commission and special officer for these employees. That commission was issued at the request of McCane's Agency. At that time, Horton & Horton were in the sand and, I think, the gravel business. Mr. Tilling had nothing to do with the delivery or sale of sand or gravel. I don't know if Horton & Horton are also contractors. * * *

"The amount that Horton & Horton paid us for the services of a watchman did not have any control or any influence as to what we paid our watchmen. We paid our watchmen whatever we agreed to pay them. That had nothing to do with what Horton paid us."

The president of the concern, among other things, testified: That he did not know Tilling personally, but had seen him there; that he did not know from time to time what watchman McCane sent out to watch the place; that he did not tell McCane whom he should or should not send; that different watchmen were sent at different times; that no particular watchman was requested; that he did not know what salary McCane paid any watchman; that he got his bills from McCane and paid them to McCane; that these bills were for one watchman "or whatever we had." He then added this statement:

"I did not know what portion, if any, of the money we paid McCane's was used for the various expenses of his business. I did not have anything to do with how much salary he paid the watchmen he sent me."

The facts as above recited, inclusive of those thus appearing in the quoted stipulation and testimony, were by mutual conces-

sion of the litigants undisputed, so that it is only necessary in this tribunal to determine their legal effect.

[1-3] Under them, we conclude that such relation as there was between the Horton firm and Tilling was not one of employer and employee within the purview of our quoted compensation statute, but that the latter's "contract of hire" was solely with and referable to the McCane Detective Agency, which occupied toward Horton & Horton in the matter of furnishing a watchman's service for its plant the position of an independent contractor. There was no sort of privity of contract between Tilling and the Horton firm; it neither exercised any control over nor knew him as an individual in the transaction at all, not only dealing exclusively for the services it desired with an independent agency engaged in that business generally, but also depending wholly upon it for proper doing of the work so agreed upon. In such circumstances, no reason occurs to us under our Texas authorities for not holding Tilling to have been an employee of the McCane Agency, and that the latter, in turn, in so using him simply furnished the watchman's service to Horton & Horton as a turnkey job; Kirby Lumber Co. v. McGilberry (Tex. Civ. App.) 205 S. W. 835; Crow v. McAdoo, Director General (Tex. Civ. App.) 219 S. W. 243; Shannon v. Indemnity Co. (Tex. Com. App.) 257 S. W. 523; Mashburn v. Tex-Ken Oil Corp. (Tex. Civ. App.) 261 S. W. 460; Fink v. Brown (Tex. Civ. App.) 183 S. W. 46; Buick Automobile Co. v. Weaver (Tex. Civ. App.) 163 S. W. 594; Maryland Cas. Co. v. Scruggs (Tex. Civ. App.) 277 S. W. 768; Mansfield v. Gorsline (Tex. Civ. App.) 278 S. W. 485. See also, Oil Co. v. Anderson, 29 S. Ct. 252, 212 U. S. 218, 53 L. Ed. 480.

[4] It is true the evidence shows the clock to have been furnished Tilling each night by the Horton firm, and that he turned in to it the next morning the paper slips registered thereon; obviously, however, this in no way amounted to a supervision or direction by it of the manner and form of his doing the work, but merely afforded it a convenient method of determining from time to time whether or not his principal, the McCane agency, was furnishing it the service contracted for.

On principle, we are unable to distinguish this case from that of Kirby v. McGilberry, supra, by the Beaumont Court of Civil Appeals, in which the Supreme Court refused to take jurisdiction, and which we regard as sound. If the two foreign cases cited and relied upon by appellant, In re Duncan, 73 Ind. App. 270, 127 N. E. 289, and Birdwell Co. v. Davidson, 174 N. W. 592, 187 Iowa, 809, 8 A. L. R. 1058, by the Supreme Courts of Indiana and Iowa, respectively, hold differently upon facts and statutory provisions in effect the same, we cannot follow them into a divergent path from that so marked out by our own appellate courts.

McGilberry's relation there to the Kirby Company was not in controlling features different from that of Tilling to the Horton Company here; the circumstance that the scaling work by him was being done on the Houston Oil Company's land is without significance, because the Kirby Company was there on the ground cutting the timber, and so was as completely occupying it for that purpose as if it had been its own. Outlining in other respects what seems to us to be an essentially analogous situation to that obtaining here, as the basis of its holding that McGilberry was not an employee of the Lumber Company, the court said:

"According to the undisputed evidence introduced on the trial below, Sanford McGilberry had been selected and employed by the Houston Oil Company of Texas to scale timber sold by said company to the Kirby Lumber Company, and the Houston Oil Company, in consideration for his services in that capacity, regularly paid to McGilberry $70 per month, and his name was carried upon the pay roll of the Houston Oil Company of Texas as its employee in the capacity of log scaler. It was also shown, without dispute in the record, that the Kirby Lumber Company had nothing to do with the selection or the employment of Sanford McGilberry, and that the Kirby Lumber Company had or exercised no control or direction whatever over said McGilberry in the discharge of his duties as such scaler, and had no right to discharge him, but, on the contrary, it was affirmatively shown that the Houston Oil Company of Texas alone selected and employed the said McGilberry, and that he was under the direction and control of the Houston Oil Company of Texas in the discharge of his duties as log scaler, and that said company alone had the right to discharge him."

The conclusion that Tilling was not an employee of Horton & Horton requires an affirmance of the trial court's judgment, irrespective of the further question of whether or not he was killed while in the course of his employment. Were we called upon to determine that matter, we should hold that he was.

Affirmed.